**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **DR. JOSEPH C. MAJDALANI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 3:18-CV-894-GMB** |
| | ) | |
| **AUBURN UNIVERSITY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN PART**</u>

<u>**OF COUNSEL:**</u>

David R. Boyd (ASB-0717-D52D)
dboyd@balch.com
W. Joseph McCorkle, Jr. (ASB-3914-O65W)
jmccorkle@balch.com
Aria B. Allan (ASB-2064-E10Q)
aallan@balch.com

Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101
334/834-6500

259344.5

Introduction .................................................................................................................1

Standard of Review ......................................................................................................1

Background ..................................................................................................................2

        A.    Majdalani's Tenure as Chair ...............................................................2

        B.    Judging at the AIAA and the Subsequent Investigation .............................4

        C.    The EthicsPoint Report ......................................................................5

        D.    Majdalani's Damages Claims ..............................................................6

Argument ....................................................................................................................6

    I.    The Court Lacks Subject Matter Jurisdiction Over Certain Claims. ......................7

        A.    Auburn is immune from suit. ...............................................................7

        B.    Defendants in their official capacities are also immune from suit.............10

    II.    Majdalani's First Amendment Claims Fail as a Matter of Law and Because of Immunity. ...................................................................................................11

        A.    Defendants Boosinger, Winn, Roberts, Thurow, Goldstein, and Teeter in their individual capacities enjoy the protection of qualified immunity. ...................................................................................11

        B.    The Individual Defendants acted within the scope of their discretionary authority. ..............................................................12

        C.    Majdalani's free speech claim (Count One) fails as a matter of law, and, in any event, the Individual Defendants are immune because they did not violate any clearly established right. ...............................13

            1.    Scoring papers and judging as speech ...........................................14
            2.    Speech related to the disciplinary proceedings at Auburn.............15

        D.    The Individual Defendants did not violate clearly established law as to Majdalani's rights of association (Count Two). ..................................16

    III.    Majdalani Fails to State Claims Upon Which Relief can be Granted...................19

        A.    Counts Three and Four should be dismissed against the Individual Defendants because they are not the "employer." ...................................19

        B.    Defendants Leath and Hardgrave are due to be dismissed for Majdalani's failure to state a claim against them......................................20

        C.    Majdalani has failed to state a claim for relief under Title VII (Count Three). .........................................................................................21

            1.    Majdalani's disparate treatment claim based on his demotion from Chair of the Department is untimely, and he did not otherwise suffer an adverse employment action..........................22

2.      Majdalani's retaliation claim fails for lack of an adverse employment action. .......................................................................25

D.      Count Four fails because the alleged harassment was not severe or pervasive. ................................................................................26

E.      Count Six (conspiracy to violate Majdalani's civil rights (42 U.S.C. § 1985)) is barred at least in part by the applicable statute of limitations. ...29

F.      Count Eight (defamation) should be dismissed because the speech is privileged. .........................................................................30

G.      Count Nine fails to state a claim for invasion of privacy. .........................32

H.      Because the underlying causes of action fail, the Alabama civil conspiracy claim also fails. .......................................................34

Conclusion .....................................................................................................35

259344.5

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants[1] move to dismiss with prejudice Counts One through Nine, in whole or in part, as more fully explained below, of Plaintiff Joseph Majdalani's Complaint (Doc. 1). As grounds for this motion, Defendants show the following:

## Introduction

Majdalani has filed a 66-page Complaint with 354 paragraphs alleging nine causes of action against ten defendants. *See generally* Compl., Doc. 1. Counts One through Nine are due to be dismissed, either in whole or in part, for lack of subject matter jurisdiction and/or for failure to state a claim upon which relief can be granted. For many of these causes of action, moreover, Defendants are entitled to immunity.

## Standard of Review

Courts typically construe an assertion of immunity as a challenge to subject matter jurisdiction under Rule 12(b)(1), especially when "the jurisdictional challenge does not implicate the underlying merits of the case." *Boglin v. Bd. of Trustees of Alabama Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1261 (N.D. Ala. 2018). In a facial, rather than factual, attack on the complaint, the court must "merely . . . look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [his] complaint are taken as true for the purposes of the motion." *Id.* (internal marks and citation omitted).

---

[1] Majdalani has named 10 defendants in this action: Auburn University ("Auburn"); Auburn University Board of Trustees in its representative capacity ("Board of Trustees"); Auburn President Steven Leath in his individual and official capacities; current Provost William Hardgrave in his individual and official capacities; former Provost Timothy Boosinger in his individual and official capacities; Associate Provost John Winn in his individual and official capacities; Dean Christopher Roberts in his individual and official capacities; Professor Brian Thurow in his individual and official capacities; Professor R. James Goldstein in his individual and official capacities; and Professor Lawrence Teeter in his individual and official capacities.

Under Rule 12(b)(6), "a motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint." *Cardwell v. Auburn Univ. Montgomery*, 941 F. Supp. 2d 1322, 1330 (M.D. Ala. 2013). The Court must "accept[ ] as true all well-pleaded factual allegations in the complaint, viewing them in the light most favorable to the plaintiff." *Id.* When "'no construction of the factual allegations will support the cause of action,'" the Court will grant the motion. *Id.* (quoting *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.3d 1171, 1174 (11th Cir. 1993)). Moreover, the complaint must fully comply with the pleading requirements under Fed. R. Civ. P. 8(a). *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009)). Under these standards, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1949. Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### **Background**[2]

#### A.      **Majdalani's Tenure as Chair**

Majdalani, born in Lebanon and of the Semitic race, joined Auburn's faculty as a tenured professor and Chair of the Aerospace Engineering Department in the fall of 2013. Compl., Doc. 1, ¶¶ 16, 21, 29. He appointed Professor Brian Thurow as his Assistant Chair. *Id.* at ¶ 54. Majdalani also hired a former student, Josh Batterson, as a Research Assistant Professor to assist

---

[2] Defendants present the facts as alleged in the Complaint (Doc. 1) as true in the light most favorable to Plaintiff solely for the purposes of this motion. Defendants reserve their right to deny any and all allegations and to present defenses in any future pleadings, motions, or otherwise.

259344.5

him with his research projects. *Id.* at ¶ 56. Batterson did not obtain the funding he needed to continue in his position and left Auburn in November 2015. *Id.* at ¶ 73.

Upon his arrival, Majdalani felt certain other faculty members in his Department held racial and national origin biases against him. *See id.* at ¶¶ 22, 33, 35. Professors Thurow, Cicci, and Gross demonstrated their biases by calling Majdalani inappropriate slurs, excluding him from lunch invitations and other group meetings, and excluding him from emails and other intra-departmental communications and discussions. *See id.* at ¶¶ 36, 38. They complained that he spoke "to[o] much" and "to[o] fast." *Id.* at ¶ 65. These professors overall refused to recognize Majdalani's authority as Chair because of Majdalani's race and national origin. *Id.* at ¶ 42. Batterson, who resented being made a Research Assistant Professor and not a tenure-track professor, fell in with those biased against Majdalani and lodged complaints against him. *Id.* at ¶ 67–70. Dean Roberts acknowledged these problems when he stated, "Joe has a racial problem in his Department." *Id.* at ¶ 46. Majdalani encountered racial biases outside the Department as well. Associate Provost Winn referred to him as the "Lebanese guy." *Id.* at ¶ 48.

Majdalani believes certain members of the Department and Auburn's administration plotted from the outset to have him removed as Chair or from the Department. The "Lunch Bunch," comprised of Caucasian professors who demonstrated racial biases, consistently made complaints against him to Dean Roberts and others in the administration. Their designs against him culminated in the winter of 2016 when he was removed as Chair under duress. *See* Compl., Doc. 1, ¶¶ 80–83. In February 2016, Dean Roberts met with Majdalani and told him that the faculty in his Department was unhappy with his "management style." *Id.* at ¶ 84. At this meeting, Dean Roberts presented Majdalani with two options: either (1) resign as Chair, accept an endowed chair position, and go on administrative leave for the remainder of the spring term or

3

(2) be removed as Chair publicly. *Id.* at ¶ 85. Majdalani signed a pre-drafted resignation letter, resigning as Chair effective May 16, 2016, and went on the prescribed administrative leave. *Id.* at ¶¶ 85, 87.

### B.    Judging at the AIAA and the Subsequent Investigation

Upon his arrival at Auburn, Majdalani became the faculty advisor to the Auburn student chapter of The American Institute of Aeronautics and Astronautics (the "AIAA"), a position previously held by Thurow. *Id.* at ¶ 52. In addition to his role as faculty advisor, Majdalani volunteered as a judge at the AIAA's conferences. *Id.* at ¶ 55. While on leave in the spring of 2016, Majdalani judged student papers at the regional conference. *Id.* at ¶ 89. He recognized one Auburn student's paper and gave it a low score because he disagreed with the paper's theoretical conclusions. *Id.* at ¶ 100, 103. Unbeknownst to him, Batterson had served as this student's faculty advisor on the paper prior to his departure from Auburn, and Batterson considered the low score as a personal affront. *Id.* at ¶ 107.

In April 2016 Batterson told Thurow, who was serving as the interim Chair of the Department,[3] that Majdalani in his scoring of papers in the AIAA conference had "intentionally and wrongly manipulated … grades due to a negative bias" against Auburn. Doc. 1, ¶ 108. Thurow, looking for an excuse to oust Majdalani, reached out to the AIAA to investigate the accusation. *Id.* at ¶ 115. The AIAA's judging coordinator provided Thurow with Majdalani's scores and other confidential data from the conference that indicated to Thurow that Majdalani had engaged in unethical conduct as a technical judge for the conference. *Id.*

---

[3] Around this same time, Thurow was nominated as Chair by the Department faculty. *Id.* at ¶ 125–26.

259344.5

C.      **The EthicsPoint Report**

Using the information provided by the AIAA and after consultation with Dean Roberts, Thurow initiated disciplinary proceedings against Majdalani at Auburn by filing an internal EthicsPoint Report. Compl., Doc. 1, ¶¶ 127, 132. In the Report, Thurow alleged that Majdalani had engaged in unethical behavior while judging at the AIAA conference. Specifically, he alleged that "Dr. Majdalani [had] displayed severe negative bias to papers from Auburn University and Vanderbilt University" and "a clear positive bias for papers associated with . . . his own graduate students." *Id.* at ¶¶ 132, 134–35. During the spring and summer of 2016, the allegations of the Report moved through an administrative process that included a review by members of the Faculty Senate Executive Committee, including Defendants Goldstein and Teeter, who recommended that the matter be advanced to the Informal Dismissal Review Committee, where it was slated for review in September 2016. *Id.* at ¶ 150–52, 158, 160. Provost Boosinger and others seeking Majdalani's dismissal delayed submitting the Report to the Committee in order to secure Majdalani's vote for Thurow as Department Chair. The vote was scheduled for October 21, but the Report was due by October 18. To circumvent the timing, Dean Roberts and Associate Provost Winn had faculty members cast votes prior to the deadline. Once Majdalani had voted for Thurow as Chair, the Report was filed with the Review Committee. *See id.* at ¶¶ 162, 165.

Once the Review Committee had the Report, Associate Provost Winn blocked Majdalani's attempts to communicate with the Committee or otherwise present a defense. The Committee recommended the question of dismissal move forward to formal review. *Id.* at ¶¶ 169, 171, 175–76. Majdalani appealed, but the Committee affirmed its decision in March 2017. *Id.* at ¶ 182. Majdalani was incredulous that the Committee had recommended the dismissal

proceeding move forward, because the AIAA had issued a letter clearing him of any unethical behavior or other charges. *Id.* at ¶ 199.

The Hearing Panel heard testimony over two days in August 2017. *Id.* at ¶ 217. Certain professors, including Thurow, who were biased against Majdalani, testified against him at the hearing. *Id.* at ¶ 218. In September 2018, the Hearing Panel voted and recommended Majdalani's dismissal. *Id.* at ¶ 223. Majdalani appealed this recommendation to President Leath. Majdalani received letters of support from former faculty members and the AIAA. *Id.* at ¶¶ 226–31. President Leath overturned the recommendation, and Majdalani continues to serve Auburn as a tenured faculty member in the Department. *Id.* at ¶ 232.

### D.   Majdalani's Damages Claims

In January 2017, Majdalani filed a grievance against Thurow for his conduct related to the EthicsPoint Report. Doc. 1, ¶ 183. In January 2018, the Grievance Committee found that Thurow had acted unethically, yet he has not been removed as Chair. *Id.* at ¶ 239. Majdalani further claims Thurow reassigned two of his courses in the Spring and Summer of 2017 to punish him, especially after Majdalani filed an EEOC charge in June 2017. This change in teaching assignment caused Majdalani to lose income of approximately $15,000. *Id.* at ¶¶ 280–81. Majdalani incurred approximately $70,000 in attorneys' fees to defend himself in the disciplinary proceedings, and he owes his lawyers $7,768. *Id.* at ¶¶ 236–37. Moreover, he has suffered mental anguish and injury to his reputation as a result of the Report and dismissal proceedings against him.

## <u>Argument</u>

Majdalani's lengthy and involved Complaint is due to be dismissed in part because most or all Defendants are shielded by immunity and/or privilege and because the Complaint fails to

state claims which could entitle him to relief. While long on legal conclusions, the substance of the Complaint is short on factual allegations to support the causes of action.

## I.  The Court Lacks Subject Matter Jurisdiction Over Certain Claims.

Majdalani fails to establish this Court's subject matter jurisdiction over certain claims because of the immunities granted by the Eleventh Amendment and by Article XIV of the Alabama Constitution. Auburn and, by extension, the Individual Defendants in their official capacities, enjoy those immunities, as detailed below. Accordingly, the claims asserted against them in Counts One, Two, Five, Six, and Seven are due to be dismissed under Federal Rule of Civil 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### A.  Auburn is immune from suit.

The Eleventh Amendment shields Auburn from most of this litigation and bars Majdalani's § 1983, § 1981, and § 1985 claims, as stated in Counts One, Two, Five, and Six, against it. The Eleventh Amendment states the "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. As this Court has recognized,

> [I]t is "well-settled that Eleventh Amendment immunity bars suits brought in a federal court when … an 'arm of the State' is sued." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)); *Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 101 S. Ct. 1032, 67 L. Ed. 2d 132 (1981) (holding that an agency of state government is part of the state for Eleventh Amendment purposes).

*Cardwell*, 941 F. Supp. 2d at 1327–28 (emphasis in the original). Because Auburn is an arm of the State of Alabama, it "enjoys sovereign immunity under the Eleventh Amendment." *Id.* "The

question of whether an Alabama university is an agency or instrumentality of the state and thus immune from suit has been answered in the affirmative on a number of occasions." *Price v. Univ. of Ala.*, 318 F. Supp. 2d 1084, 1088 (N.D. Ala. 2003) (citing *Massler v. Troy State Univ.*, 343 So. 2d 1 (Ala. 1977); *Ellison v. Abbott*, 337 So. 2d 756 (Ala. 1976); *Rigby v. Auburn Univ.*, 448 So. 2d 345 (Ala. 1984); *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985)); *see also Doe v. Univ. Ala. in Huntsville*, 117 F. Supp. 3d 1380, 1387 (N.D. Ala. 2016) (dismissing claim against UAH for lack of jurisdiction based on immunity); *Boyett v. Troy State Univ. at Montgomery*, 971 F. Supp. 1403, 1411 (M.D. Ala. 1997) (dismissing § 1983 claims against TSUM); *Vandenburg v. Aramark Educational Servs., Inc.*, 81 So. 3d 326, 332–33 (Ala. 2011).

Although the Eleventh Amendment creates two exceptions to sovereign immunity—where Congress has overridden the immunity or where the State has waived it—neither applies in this case.   *See Boyett*, 971 F. Supp. at 1410–11. Congress has not abrogated Eleventh Amendment immunity in § 1983 cases, and the State of Alabama has not waived its immunity. *Id.* at 1411; *Doe*, 177 F. Supp. 3d at 1387; *Cardwell*, 941 F. Supp. 2d at 1328 ("Absent a valid waiver or abrogation, [Auburn University Montgomery] may not be sued in federal court for either money damages or injunctive relief."); *see also Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. Unit A 1981) (holding that the Eleventh Amendment applies in § 1981 litigation); *Fincher v. State of Fla. Dep't of Labor and Emp't Sec. Unemp't Appeals Comm'n*, 798 F.2d 1371, 1372 (11th Cir. 1986) (holding that the Eleventh Amendment applies in § 1985 litigation). Thus, the Court must dismiss Majdalani's § 1983, § 1981, and § 1985 claims (Counts One, Two, Five, and Six) against Auburn as a matter of law.

Majdalani's claims against Auburn brought pursuant to 42 U.S.C. § 1983 must also be dismissed because Auburn is an arm of the State of Alabama and not a "person" subject to suit

259344.5

under § 1983. *Cardwell*, 941 F. Supp. 2d at 1329 (citing *Lapides v. Bd. of Regents*, 535 U.S. 613, 617, 122 S. Ct. 1640 (2002); *Carr v. Bd. of Regents of the Univ. Sys.*, 249 F. App'x 146, 148 (11th Cir. 2007); *Bryant v. Jones*, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009)). Simply put, "a state is not considered to be a 'person' for purposes of § 1983 actions," and claims against Auburn, as an instrumentality of the State, must be summarily dismissed. *Boyett*, 971 F. Supp. at 1410–11; *Rossi v. Troy State Univ.*, 330 F. Supp. 2d 1240, 1244 (M.D. Ala. 2002); *Harden*, 760 F.2d at 1163–64. Thus, this Court lacks subject matter jurisdiction over Auburn. Further, Majdalani has failed to state a claim upon which relief can be granted because Auburn is not a "person" subject to a § 1983 claim, and Counts One, Two, Five, and Six must be dismissed with prejudice.

Majdalani's state law claims for civil conspiracy, defamation, and invasion of privacy, Counts Seven through Nine respectively, are also barred by sovereign immunity. As stated above, Auburn is an instrumentality of the State and partakes of State immunity. Alabama Const. of 1901, art. XIV §§ 266, 267, amends. 161, 670 (establishing Auburn University as an organic agency of the state); *see, e.g.*, *Rigby v. Auburn Univ.*, 448 So.2d 345 (Ala. 1983) (holding that Auburn University is an instrumentality of the State of Alabama); *Wadibia v. Auburn Univ.*, No. 98–0722–BH–M, 1999 U.S. Dist. Lexis 14122, *36–37 (S.D. Ala. Aug. 26, 1999) (state law claims against Auburn barred by Eleventh Amendment). As an instrumentality of the State, Auburn[4] is protected by this immunity from Majdalani's state law claims. *See*, *e.g.*, *Smith v.*

---

[4] The Auburn Board of Trustees is not an entity separate and apart from Auburn. Even if it were, it would be protected by the same state immunity shielding Auburn and the Individual Defendants in their official capacities from both federal and state law claims.  Thus, Counts One through Seven against the Board of Trustees should be dismissed with prejudice. *See Kelley*, 923 F. Supp. at 1499 (dismissing claims against Board of Directors of Troy State University on the basis that the Board was not an independent entity and that the claims against it were redundant because the plaintiff had sued the university itself).

*Auburn Univ.*, 201 F. Supp. 2d 1216, 1228 (M.D. Ala. 2002) (holding that plaintiff's negligence and wantonness claims fail: "First of all, Auburn University is entitled to absolute immunity under Article I, §14 of the Constitution of Alabama 1901."). Because of these immunities, all state law claims against Auburn should be dismissed.[5]

**B.      Defendants in their official capacities are also immune from suit.**

Defendants Leath, Hardgrave, Boosinger, Winn, Roberts, Thurow, Goldstein, and Teeter (collectively the "Individual Defendants") enjoy the same immunity as Auburn from suits against them in their official capacities. To the extent that any claim is intended against the Individual Defendants in their official capacities as officials of Auburn, the Individual Defendants benefit from the same Eleventh Amendment immunity that protects Auburn. *See Jones v. Ward*, No. 10–cv–202–MEF, 2011 WL 1187807, at *5 (M.D. Ala. March 30, 2011) ("A suit against a state officer in his official capacity is effectively a suit against the state."); *Greenwell v. Univ. of Ala. Bd. of Trs.*, No. 7:11–2313–RDP, 2012 WL 3637768, at *7, *9 (N.D. Ala. Aug. 22, 2012) (for analysis under the Eleventh Amendment stating "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself"; and stating "Sovereign immunity under § 14 bars a court from having subject-matter jurisdiction over claims against the State. . . . "[t]he State cannot be sued indirectly by suing an officer in his or her official capacity. . . . Section 14 prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State.") (internal citations and quotations omitted).

Accordingly, Counts One, Two, Five, and Six against the Individual Defendants in their official capacities should be dismissed with prejudice. Similarly, state immunity shields the

---

[5] Auburn concedes that it is not immune from Majdalani's claims based on Title VII as stated in Counts Three and Four.

Individual Defendants from suit in their official capacities. As instrumentalities of the State, they are protected from suit. *See*, *supra*, pp. 8–9. Thus, Count Seven[6] against the Individual Defendants in their official capacities should be dismissed as well.

## II.     Majdalani's First Amendment Claims Fail as a Matter of Law and Because of Immunity.

Majdalani's claims in Counts One and Two against the Individual Defendants in their individual capacities are due to be dismissed because the claims fail on the merits as a matter of law and because the Individual Defendants are entitled to qualified immunity. As to Count One, which is predicated on retaliation for protected speech, Majdalani did not speak as an individual on a matter of public concern. Count Two, alleging retaliation for Majdalani's association with the AIAA, fails because Auburn's interests as an employer are weighted in its favor in the *Pickering* balancing test. Further, any "constitutional right" Majdalani claims to have been violated was not clearly established by applicable law, and thus the Individual Defendants were not on notice that their actions would infringe such a right.

### A.     Defendants Boosinger, Winn, Roberts, Thurow, Goldstein, and Teeter in their individual capacities enjoy the protection of qualified immunity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Mikko v. City of Atlanta,*

---

[6] Majdalani brings Counts One through Seven against "Defendants" without specifying which defendant (and in which capacity) did what. Plaintiff provides some clarification in Counts Eight and Nine by naming with specificity the defendants to whom the allegations of those counts apply. In Count Eight, he brings a claim for defamation "against Defendants named in their individual capacities," and in Count Nine he alleges an invasion of the right to privacy against Defendants Winn, Thurow, and Roberts in their individual capacities. *See* Compl., Doc. 1, ¶¶ 316, 347.

*Georgia*, 857 F.3d 1136, 1143 (11th Cir. 2017) (quotation marks and citation omitted). To establish the protections afforded by qualified immunity,

> an official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. If he does that, the burden shifts to the plaintiff to establish (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.

*Id.* at 1143–44 (internal quotation marks and citations omitted). Once the Individual Defendants establish they "were acting at least within the outer perimeter of [their] discretionary duties, … the burden on the qualified immunity issue shifts to" Majdalani. *Id.* at 1145 (quotation marks and citation omitted). Majdalani must demonstrate that the defendants' conduct "violated a … constitutional right that was clearly established at the time of their conduct." *Id.*

**B.    The Individual Defendants acted within the scope of their discretionary authority.**

Each Individual Defendant was acting within the scope of his discretionary authority because the alleged actions were "(1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority." *Id.* To delineate whether the actions were taken within the discretionary authority, courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances. In other words, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, *the outer perimeter* of an official's discretionary duties." *Id.* (internal marks and citations omitted) (emphasis in the original).

In each instance, the Individual Defendants in question were "performing a function that, *but for* the alleged constitutional infirmity, would have fallen with[in] his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)

(emphasis in the original). Thurow, as acting Chair, had the authority and obligation to investigate and to report allegedly unethical behavior of faculty members within the Department. Dean Roberts, as Dean of the College, had the same interest and authority; the administrators in the Provost's Office—Boosinger and Winn—also were acting within the scope of their administrative capacity in overseeing the disciplinary process. Finally, Goldstein and Teeter were acting within the scope of their job functions in their positions with the Faculty Senate Executive Committee as they reviewed the allegations against Majdalani at the request of the Provost's Office and Majdalani's Dean and recommended that the allegations should be investigated and heard. *See Williams v. Ala. State Univ.*, 103 F.3d 1179, 1182–84 (11th Cir. 1997) (holding that state university administrators engaging in faculty discipline were entitled to qualified immunity on the professor's claim for First Amendment retaliation).

> **C.**  **Majdalani's free speech claim (Count One) fails as a matter of law, and, in any event, the Individual Defendants are immune because they did not violate any clearly established right.**

Although it is uncontested that "public employees do not surrender all their First Amendment rights by reason of their employment," their speech must be "as a citizen addressing matters of public concern:"

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke *as a citizen on a matter of public concern*. If the answer is no, the employee *has no First Amendment cause of action* based on his … employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its *role as employer*, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti v. Ceballos*, 547 U.S. 410, 417–18, 126 S. Ct. 1951, 1957–58 (2006) (citing *Pickering v. Board of Ed. Of Township High School Dist., 205, Will Cty.*, 391 U.S. 563, 88 S. Ct. 1731 (1968)) (emphasis added).

Because the Individual Defendants "were acting within the outer perimeter of [their] discretionary duties, … the burden on the qualified immunity issue shifts to" Majdalani. *Mikko*, 857 F.3d at 1145 (quotation marks and citation omitted). Majdalani must demonstrate that the defendants' conduct "violated a … constitutional right that was clearly established at the time of their conduct." *Id.* To do so, the court must "look to the prevailing First Amendment law at the time of the defendants' alleged conduct." *Williams*, 103 F.3d at 1182. "[T]he clearly established law must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Gaines v. Wardynski*, 871 F.3d 1203, 1207 (11th Cir. 2017). The Eleventh Circuit has noted, "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." *Gaines*, 871 F.3d at 1210.

Majdalani contends two acts of protected speech prompted retaliation against him: first, speech in the form of scoring papers at the AIAA's spring 2016 conference and, second, speech relating to the Report and the dismissal proceedings.

### 1.    Scoring papers and judging as speech

Majdalani asserts that the Individual Defendants retaliated against him for the grades that he awarded in what he describes as his private (i.e. non-Auburn) capacity as a volunteer judge with the AIAA. *See* Compl., Doc. 1, ¶¶ 242–48. This speech, however, is not actionable under the First Amendment because it is not within the realm of "public concern," which "relat[es] to a[ ] matter of political, social, or other concern to the community." *Cottrell v. Chickasaw City Schls. Bd. of Educ.*, 307 F. Supp. 3d 1264, 1273 (S.D. Ala.) (quoting *Connick v. Myers*, 461 U.S.

14

138, 146, 103 S. Ct. 1684, 1690 (1983)) (internal marks omitted). "[I]t must be determined whether the purpose of the speech was to raise issues of public concern, on the one hand, or to further private interest, on the other." *Id.* (quoting *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993)). Majdalani himself asserts that these grades were "private," *see* Compl., Doc. 1, ¶ 114, and because the grades did not relate to a matter of public concern, Majdalani "has no First Amendment cause of action based on his … employer's reaction to the speech." *Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958. On the merits, the retaliatory conduct alleged is not actionable because the speech itself is not a protected statement regarding a matter of public concern.

Even if the Court were to determine that the scores and related comments did address a matter of public concern, the Individual Defendants are entitled to dismissal based on qualified immunity. As the *Gaines* court instructs, courts analyzing qualified immunity must ask particularized questions rather than broad ones. *Gaines*, 871 F.3d at 1210. For Majdalani's speech claim, the question is: was it clearly established in 2016 (by the U.S. Supreme Court, the Eleventh Circuit, or the Supreme Court of Alabama) that a professor's scoring and judging activities at an industry conference address a matter of public concern? The answer is clearly "no." No binding case law exists to put the Individual Defendants on notice that the question would be answered in the affirmative or that their retaliation for this type of speech would violate constitutional freedoms. *See Gaines*, 871 F.3d at 1209, 1213. Accordingly, the Individual Defendants are entitled to qualified immunity.

### 2.    Speech related to the disciplinary proceedings at Auburn

Majdalani also argues that his speech refuting the Report and otherwise fighting the dismissal proceedings incited retaliation. *See* Compl., Doc. 1, ¶ 250. This type of internal speech (i.e. within the confines of the Auburn disciplinary process) has been held to be activities that "concern[ ] internal administration of the educational system and personal grievances" and thus

15

do not receive constitutional protections. *Williams*, 102 F.3d at 1183 (internal marks omitted) (citing *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988)); *see also Stavropoulos v. Firestone*, 361 F.3d 610, 621 (11th Cir. 2004) (affirming grant of qualified immunity to university administrators involved with faculty hiring and discipline), *abrogated on other grounds by Burlington N. & Santa Fey Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006). Majdalani's speech—both as to the scores assigned and to the disciplinary proceedings at Auburn—is thus not afforded constitutional protections, and any claims based thereon fail to state a claim upon which relief can be granted. In addition, the Individual Defendants are entitled to immunity because Majdalani cannot show, under the applicable standard discussed above, that the Individual Defendants violated a clearly established constitutional right.

> **D.    The Individual Defendants did not violate clearly established law as to Majdalani's rights of association (Count Two).**

Majdalani also alleges that the Individual Defendants retaliated against him for his association with the AIAA as a judge, which, he contends, qualifies as an act of expressive association. Compl., Doc. 1, ¶¶ 265–66; *see Gaines*, 871 F.3d at 1212 ("The right of expressive association—the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion—is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms.") (internal marks and citation omitted). Unlike a speech claim, "a public employee is shielded from retaliation by his employer on the basis of the employee's associational activity whether or not such activity relates to a matter of public concern." *Green v. City of Montgomery*, 792 F. Supp. 1238, 1252 (M.D. Ala. 1992). The courts instead look to the remaining three steps of the *Pickering* analysis:

> The first step is for the court to balance an employer's interest in
> maintaining an efficient workplace against the weight accorded to

16

the employee's First Amendment rights. If the First Amendment interest is of sufficient importance, Plaintiff[ ] then ha[s] the burden of showing that the protected activity "was a substantial motivating factor in the" [adverse employment action]. If Plaintiff[ ] demonstrate[s] this, the burden shifts to Defendants to prove by a preponderance of the evidence that they [would have taken the adverse action], even in the absence of the protected conduct.

*Cottrell*, 307 F. Supp. 3d at 1283 (internal citations omitted); *see also Doggrell v. City of Anniston, Ala.*, 277 F. Supp. 3d 1239, 1260 nn. 19–20 (N.D. Ala. 2017) (applying the *Pickering* test to freedom of association claims). For purposes of this analysis, the Individual Defendants do not contest Majdalani's right to associate with the AIAA is protected. Yet the *Pickering* balancing test weighs in favor of the employer's interests, as explained below.

Majdalani's interests in associating with the AIAA, especially as the faculty advisor for the Auburn student chapter, must be balanced against Auburn's interest in "maintaining an efficient workplace." *See* Compl., Doc. 1, ¶ 52 (stating that Majdalani became the faculty advisor for the student chapter to the AIAA upon his arrival at Auburn). Inherently, then, Majdalani's association with the AIAA as a judge relates to his employment at Auburn, and Auburn has a legitimate and compelling interest in ensuring that its faculty represents Auburn in a professional and ethical manner. Scoring anomalies or other improper judging activities—whether suspected or proven—impact Auburn's reputation not only at the AIAA but potentially throughout the higher education community. In addition, to the extent such alleged activities affected Auburn students—*see, e.g.*, Compl., Doc. 1, ¶ 134 (the EthicsPoint Report prepared by Thurow states that "Dr. Majdalani displayed a severe negative bias to papers from Auburn University and Vanderbilt University") —they run afoul of Auburn's mission and objective as an educational institution. Any university disciplinary proceedings based on allegations of improper behavior at an industry conference that connects the individual to Auburn necessarily relates to Auburn's interest in workplace efficiency. Indeed, the alleged retaliation was not based on Majdalani's

17

association with the AIAA, which was encouraged and required in his role as the student chapter faculty advisor, but instead on his improper behavior as a judge. Thus, as a matter of law the balancing test tilts in favor of Auburn's interests and weighs against Majdalani's protected interest, requiring dismissal of this claim.

Further, Majdalani cannot show on the face of his Complaint that he suffered from adverse employment action. President Leath ultimately overturned the Hearing Panel's recommendation that he should be dismissed, and Majdalani continues to serve as a tenured faculty member in the Department.[7] *See* Compl., Doc. 1, ¶ 232 ("President Leath overturned the hearing panel's dismissal recommendation based on the lack of evidence supporting its conclusion."); ¶ ("[Majdalani] remains employed by the university today."). Thus, Majdalani cannot show that he suffered from an adverse action that was "substantially motivated by" his association with the AIAA.

Even if the Court were to conclude that Majdalani's claim could survive the *Pickering* balancing test, and there was an adverse employment action, the Individual Defendants would still enjoy immunity. No binding case law in this Circuit speaks to the particular facts alleged. *Gaines*, 871 F.3d at 1207 ("[T]he clearly established law must be 'particularized' to the facts of the case."). There is no case of which the Individual Defendants are aware that even suggests, much less makes clear, that, on facts closely akin to these, Majdalani's associational interests would be deemed to outweigh Auburn's institutional interests as his employer. Thus, the Individual Defendants were not reasonably forewarned that their conduct was violative of a clearly established constitutional right and are entitled to qualified immunity. *Id.* at 1209–10,

---

[7] Majdalani's removal as Department Chair was wholly unrelated to his actions as a judge at the AIAA student competitions. He resigned as Chair in May 2016, and the EthicsReport was not lodged against him until after his resignation and after the AIAA conference. *See* Compl., Doc. 1, ¶¶ 85, 88–89.

18

1213. ("Thus, as previously noted, 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'") (quoting *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)).

Majdalani has failed to state a claim which affords him relief because his speech did not relate to a matter of public concern and because his association with the AIAA was not protected under the *Pickering* balancing test and, moreover, did not result in an adverse employment action Thus, Counts One and Two against the Individual Defendants should be dismissed as a matter of law. In addition, because the Individual Defendants did not violate a right that was clearly established and were acting within the scope of their discretionary authority, they are entitled to the protections of qualified immunity. For these reasons, Counts One and Two against the Individual Defendants should be dismissed with prejudice.

**III.    Majdalani Fails to State Claims Upon Which Relief can be Granted.**

Many of Majdalani's claims are subject to dismissal under Rule 12(b)(6) because they do not state a claim upon which relief can be granted.  In some instances, he simply fails to comply with the pleading requirements of Federal Rule of Civil Procedure 8 and the *Twombly-Iqbal* standard.  In others, the facts he alleges are not actionable under controlling law.

**A.    Counts Three and Four should be dismissed against the Individual Defendants because they are not the "employer."**

Majdalani's Title VII disparate treatment (Count Three) and hostile work environment (Count Four) claims as to the Individual Defendants fail to state a viable claim. "Title VII prohibits an employer from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Matthews v. City of Mobile,* No. 14–00601–KD–N, 2016 WL 1736061, at *22 (S.D. Ala. May 2, 2016) (quoting 42 U.S.C. § 2000e–2(a)(1)). Auburn is

Majdalani's employer, not any of the Individual Defendants, and Majdalani does not allege otherwise. Therefore, none of the Title VII claims against the Individual Defendants can be maintained; "relief under Title VII is available against only the employer and not against individual employees whose actions would constitute a violation of the Act, regardless of whether the employer is a public company or a private company." *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006); *see also Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181, 1186 (M.D. Ala. 2000) (citing *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (holding that "individual capacity suits under Title VII are … inappropriate")); *Cross v. Alabama Department of Mental Health & Mental Retardation*, 49 F.3d 1490, 1504 (11th Cir. 1995) (affirming the *Busby* holding in an action brought after the 1991 amendments to Title VII; holding that liability under Title VII is limited to official-capacity actions).

Further, official capacity suits are inappropriate where the plaintiff has also sued the employer. Because Auburn is a named party, the suit against the Individual Defendants is due to be dismissed. *Moss*, 111 F. Supp. 2d at 1187 ("In other words, if a Title VII plaintiff names his or her employer as a defendant, any of the employer's agents also named in the complaint may be dismissed from the action."). For this reason, Majdalani's Title VII claims should be dismissed against the Individual Defendants in their official and individual capacities.

**B.**      **Defendants Leath and Hardgrave are due to be dismissed for Majdalani's failure to state a claim against them.**

Majdalani fails to allege any wrongdoing by President Leath or Dean Hardgrave in either their official or individual capacities. Each mention of President Leath references the appeal to him and the letters supporting Majdalani he received. *See* Doc. 1, ¶¶ 226–30, 232–33. The only action specifically taken by President Leath was his decision to overturn the recommendation of the Hearing Panel—in other words, *not* to dismiss Majdalani from Auburn's faculty. *Id.* at ¶¶

323–33 ("President Leath overturned the hearing panel's dismissal recommendation…. While the president's reversal ended the dismissal proceedings…."). Thus, the Complaint fails to state that President Leath engaged in any injurious behavior, and the claims against him are due to be dismissed with prejudice. *See Twombly*, 550 U.S. at 570 (requiring that the complaint state facts for relief that is "plausible on its face").

Similarly, Majdalani makes only two references to Dean Hardgrave, and neither statement alleges actionable conduct. Namely, Majdalani alleges that Dean Hardgrave has not yet taken action to remove Thurow as the Department Chair, despite the grievance-based finding that Thurow acted unethically in the proceedings concerning Majdalani's dismissal. *Id.* at ¶¶ 240–41. This action, alone, would not be probative of any behavior that caused injury to Majdalani. Because Majdalani does not make factual allegations that support any cause of action against President Leath or Dean Hardgrave, they are due to be dismissed with prejudice. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (a complaint does not suffice under Rule 8(a) "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'").

### C.   Majdalani has failed to state a claim for relief under Title VII (Count Three).

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). The anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. *Id.* at § 2000e–3(a).

1.     **Majdalani's disparate treatment claim based on his demotion from Chair of the Department is untimely, and he did not otherwise suffer an adverse employment action.**

Majdalani contends Auburn discriminated against him because of his race and national origin and retaliated against him after he filed an EEOC charge. *See* Compl., Doc. 1, ¶¶ 274–85; *see also Greywoode v. Sci. Applications Int'l Corp.*, 943 F. Supp. 2d 1355, 1375 (M.D. Ala. 2013) ("Because [the plaintiff] alleges that he was terminated in a discriminatory manner based on his race and national origin, the Court will analyze this claim as a disparate treatment claim."). To establish a prima facie case for disparate treatment, the plaintiff must prove: "(1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) [Auburn] treated similarly situated employees outside his class more favorably than he was treated; and (4) he was qualified to do the job." *Id.* (citing *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)). Auburn disputes that Majdalani can demonstrate that he suffered from adverse employment action.

Majdalani filed his EEOC charge alleging race and national origin discrimination on June 14, 2017. *See* Ex. A.[8] In the charge, he alleges he experienced discrimination from other professors in the Department and from Auburn administrators. After his resignation as Chair, he contends, the discrimination "escalated." *Id.* He claims to have been excluded from faculty search committees, socials, and hiring decisions. He also states diversity initiatives were thwarted and that an engineering class he was slated to teach was reassigned. *Id.* Majdalani finally charges that the dismissal hearing upcoming at that time was based on his race and

---

[8] "[D]ocuments submitted by a defendant with a motion to dismiss . . . may be considered by the court if 'the plaintiff refers to [those] documents in the complaint and those documents are central to the plaintiff's claim.'" *Gross v. White*, 340 Fed. App'x 527, 533 (11th Cir. 2009). While not attached to the Complaint, the EEOC charge is central to Majdalani's Title VII claims.

national origin and that the claims of unethical judging activities were mere pretext for this discrimination. *Id.*

The 180-day period preceding Majdalani's EEOC charge began to run on December 16, 2016. Thus, Majdalani's claims for any adverse employment action before that date must be dismissed for failure to exhaust administrative remedies. *Brewer v. Alabama*, 111 F. Supp. 2d 1197, 1204 (M.D. Ala. 2000). Specifically, to the extent that Majdalani's claim is based on his resignation as Chair, it is time-barred and procedurally deficient. As this Court explained in *Brewer v. Alabama*,

> If an employee fails to file an EEOC charge before the 180–day limitations period elapses, his or her subsequent lawsuit is procedurally barred and must be dismissed for failure to exhaust his or her administrative remedies. *See Delaware State College v. Ricks*, 449 U.S. 250, 256, 101 S. Ct. 498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County Schl. Dist.*, 138 F.3d 1407, 1410 (11th Cir. 1998).

*Id.* (emphasis added). Majdalani alleges he was "constructively discharged/demoted" from his position as Chair on February 3, 2016, and the resignation was effective on May 16, 2016. *See* Compl., Doc. 1, ¶¶ 85–86. His removal as Chair, even if it were because of discriminatory employment practices (which Auburn reserves the right to dispute), was unrelated to and separate from the EthicsPoint Report that was based upon his allegedly unethical actions as a judge at the AIAA's conference in the spring of 2016—actions that occurred *after* he resigned the Chair position. Majdalani was required to file an EEOC charge based on his removal as Chair by August 1, 2016 (February 3 plus 180 days). Instead, Majdalani waited until June 14, 2017— more than one year after his removal as Chair and more than 180 days after the filing of the Report against him. As this Court has noted, "[t]he limitations period begins to run when an employee receives notice of the alleged discriminatory act, 'not the point at which the consequences of the act become painful.'" *Id.* at 1205 (quoting *Chardon v. Fernandez*, 454 U.S.

259344.5

6, 8, 102 S. Ct. 28 (1981)). Majdalani received notice he was being removed as Chair in February 2016 and already suspected his colleagues' biases were working against him.[9] *See* Compl., Doc. 1, ¶¶ 35, 36, 46, 54, 63, 85, 283, 285, 290. Thus, his claim that he was demoted as Chair is time-barred and should not be considered.

The only other claims of disparate treatment Majdalani alleges are "his deliberate exclusion from faculty photographs, his exclusion from search committees, his exclusion from faculty search socials, his exclusion from votes relative to faculty candidates prior to the candidates receiving offers, and exclusion from all breakfasts, lunches, and dinners with visitors to the department." Compl., Doc. 1, ¶ 277. None of these actions, however, rises to the level of an adverse employment action. Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N. and Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006) (internal citation omitted). The only remaining adverse action pled in the Complaint is that Thurow reassigned an engineering course to Professor Cicci for the Spring and Summer 2017 terms. *See* Compl., Doc. 1, ¶¶ 278–80. "A university can assign its professors to teach the classes it needs them to teach." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 588 (11th Cir. 2000), *overruled on other grounds by White*, 548 U.S. 53, 126 S. Ct. 2405. The assignment of courses in a university setting is not an adverse action because it is not "objectively serious and tangible enough to alter [Majdalani's] compensation, terms, conditions, or privileges of employment, deprive…[him] of employment opportunities or adversely affect[ ] … [his] status as an employee." *Id.* at 588 (internal marks omitted) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997)). Majdalani acknowledges that "[h]e remains employed by the university today." Compl., Doc. 1, ¶ 30. As such, he did not suffer from an

---

[9] Further, Majdalani does not allege that he suffered any financial loss because of his removal as Chair. The Complaint is silent as to damages he suffered from this alleged demotion.

adverse employment action, and his claim for disparate treatment fails as a matter of law and is due to be dismissed with prejudice.[10]

### 2. Majdalani's retaliation claim fails for lack of an adverse employment action.

Similarly, Majdalani's claim for retaliation in violation of Title VII cannot stand. "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered adverse employment action; and (3) a causal link exists between the adverse employment action and protected activity." *Greywoode*, 943 F. Supp. 2d at 1378. Auburn submits that Majdalani has not suffered an adverse employment action as alleged. He states: "After receiving notice of Dr. Majdalani's E.E.O.C. charge, as retaliation for his protected activity, Thurow also reassigned course ENG 6000 to Cicci for the summer session, causing Dr. Majdalani to experience a loss in income of no less than $10,000." Compl., Doc. 1, ¶ 281.

As previously demonstrated, a university has freedom to determine what courses to teach and who should teach them. In a higher education setting, not being assigned a particular course for a particular term cannot be considered as an actionable adverse employment action. *Gupta*, 212 F.3d at 588. Thus, the mere reassignment of a course, or a decision to assign a course to one instructor rather than another, cannot without more constitute an adverse action. *See also White*, 548 U.S. at 68, 126 S. Ct. at 2415 (holding that "a plaintiff must show that a reasonable employee would have found the challenged action *materially adverse*, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of

---

[10] To the extent the allegations in Count Three allegedly support the claims in Count Five (42 U.S.C. § 1981 race discrimination), Count Five should be dismissed for the same reasons as set forth above. Title VII and § 1981 claims utilize the same analytic framework. *Smelter v. Southern Home Care Servs., Inc.*, 904 F.3d 1276, 1283 n. 3 (11th Cir. 2018).

discrimination") (emphasis added) (internal marks omitted). For these reasons, the retaliation claim pled in Count Three should be dismissed with prejudice.

### D.      Count Four fails because the alleged harassment was not severe or pervasive.

Count Four purports to state a claim for a hostile work environment under Title VII. *See* Compl., Doc. 1, ¶¶ 286–90. Yet none of the conduct of which Majdalani complains created a hostile work environment because of his race or national origin, as is required under the statute. "To establish a claim for hostile work environment, [Majdalani] must establish that: (1) he belongs to a protected group; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on his race or national origin; (4) the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of his employment; and (5) [Auburn] knew or should have known of the harassment and failed to intervene." *Greywoode*, 943 F. Supp. 2d at 1370. To demonstrate a hostile work environment under Title VII, a plaintiff must show that the "'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Majdalani generally alleges that he was slurred, that he was excluded from lunches and other faculty gatherings, and that Auburn otherwise violated his rights.[11] *See* Compl., Doc. 1, ¶¶ 277, 285, 287. Count Four is devoid of factual matter that in any way suggests discrimination *based on* or *because of* race or national

---

[11] The Court does not consider legal conclusions to be evidence of fact on a motion to dismiss. *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1949.

origin. Rather, it is littered with legal conclusions and Majdalani's speculation that the Defendants' behaviors towards him were discriminatory. *See id.* at ¶¶ 286–90.[12]

The acts that arguably are stated factually, and not merely as abstract legal conclusions, do not rise to the level of "sufficiently severe or pervasive" harassment. Title VII does not create a code of civility for the American workplace, and Title VII protects only the egregious behavior that "alter[s] the terms, conditions, or privileges of [a plaintiff's] employment." *Greywoode*, 943 F. Supp. 2d at 1370, 1373. Majdalani does not allege that his colleagues in the Department or in Auburn's administration called him names or made other insulting remarks to him or within his range of hearing. Rather, Majdalani's colleagues complained to Dean Roberts, Provost Boosinger, and Associate Provost Winn that he spoke "to[o] fast." Compl., Doc. 1, ¶ 65. Even if this complaint were directly related to Majdalani's accent and evidenced a racial or national origin bias, this conduct does not rise to the level of severe or pervasive harassment. *Greywoode*, 943 F. Supp. 2d at 1371. Further, complaints about a management style as a department chair are not hostile comments *because of* race or national origin. *See id.* While these comments and exclusions from meals and meetings might have been "insensitive and perhaps unprofessional," they "evidence nothing more than disagreements and discord among co-workers, which is not actionable under Title VII." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275 (1998)). Majdalani "must … show that race or national origin was a substantial factor in his harassment and that if it were not for these protected traits, he would have been treated differently." *Id.* at 1372. The factual allegations as pled do not sufficiently demonstrate that the alleged harassment was substantially related to Majdalani's race or national origin.

---

[12] Majdalani's Complaint is replete with invocation of earlier-pleaded paragraphs, rather than restating the pertinent facts that purport to support the cause of action. This type of shotgun pleading is disfavored in the Eleventh Circuit. *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 (11th Cir. 2014).

259344.5

Rather, they demonstrate a clash of personalities and ideas within an academic department in a large, diverse university setting. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) ("Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case, … it must provide enough factual matter (taken as true) to suggest intentional race discrimination.") (internal quotations and citations omitted). Mere speculation or legal conclusions do not suffice to survive a motion to dismiss.

In looking at the "totality of the circumstances" to determine if the alleged harassment was severe and pervasive, the Court looks to "(1) the frequency of the conduct; (2) its severity; (3) whether it was physically threatening or humiliating; and (4) whether it unreasonably interfered with [Majdalani's] work performance." *Greywoode*, 943 F. Supp. 2d at 1373. As noted above, the alleged conduct was not severe—Majdalani was omitted from some Department activities, like committee work or meetings with visitors. The conduct was not physically threatening or otherwise humiliating.[13] Majdalani alleges that Winn and Boosinger would refer to him as the "Lebanese guy" or "Lebanese professor." *See* Compl., Doc. 1, ¶¶ 48, 60. Majdalani does not allege, however, that the name calling was in his presence or to him directly, and he fails to allege the frequency of this purported harassment. Merely stating that harassment occurred is insufficient to survive a motion to dismiss. *See Davis*, 516 F.3d at 974; *Smelter v. Southern Home Care Services, Inc.*, 904 F.3d 1276, 1285–86 (11th Cir. 2018) (finding daily racial slurs directed at plaintiff to be severe and pervasive). Finally, the conduct alleged in the Complaint and in Majdalani's EEOC charge is not alleged to have actually impacted his work

---

[13] Majdalani alleges only one instance when he felt threatened. Associate Provost Winn allegedly told him, "you got one guy to worry about, and that's Emmett Winn. Okay? I will come to your office Joe, I will take your keys away from you, and I will escort you out of the building. How about that?" Compl., Doc. 1, ¶ 169. There is no allegation, however, that this alleged threat was based on or because of Majdalani's race or national origin.

performance. His exclusion from photographs and search committees is not alleged to have impacted his ability to teach or to conduct research or outreach at Auburn. *See id.*; *compare with Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 644–45, 647 (11th Cir. 1997) (finding that a question of material fact existed as to the pervasive sexual harassment that "permeated" the workplace). Because the allegations of harassment that are made do not rise to the level of severe and pervasive, such that the terms, conditions, and privileges of Majdalani's employment were altered, and because there are no allegations of actionable harassment asserted with the pleading specificity required by Fed. R. Civ. P. 8(a), Count Four should be dismissed with prejudice.

### E.   Count Six (conspiracy to violate Majdalani's civil rights (42 U.S.C. § 1985)) is barred at least in part by the applicable statute of limitations.

No statute of limitations is specified in 42 U.S.C. § 1985. The federal courts have held that the statute of limitations of the state where the claims arose that is the mostly closely analogous state action applies to determine the time within which a § 1985 claim must be filed. *Trawinski v. United Technologies*, 313 F.3d 1295, 1298 (11th Cir. 2002). Based on the Complaint, Majdalani's § 1985 claim arose in Alabama, and the two-year limitations period set forth in Ala. Code § 6-2-38(l) for personal injury applies. *Id.*

Under Alabama law, the statute of limitations for personal injury claims begins to run on the date on which the last element necessary to complete the cause of action—usually the injury—occurs. In Count Six, Majdalani alleges, among other things, that the Individual Defendants conspired to bring about Majdalani's "demotion." Compl., Doc. 1, ¶ 298. Majdalani further contends that he was "constructively discharged/demoted" from his position as Department Chair when he executed a letter of resignation on February 3, 2016, and that the resignation was effective on May 16, 2016. *Id.* at ¶¶ 85–86. He did not, however, file his Complaint in this case until October 18, 2018, more than two years after his February 3, 2016

letter of resignation and the May 16, 2016 effective date of resignation. As a consequence, to the extent that his federal conspiracy claim (Count Six) is premised on allegations that he was demoted from the position of Chair of the Department as a result of a race-based and/or national origin-based conspiracy, it is barred by Ala. Code § 6-2-38(l) and should be dismissed with prejudice as untimely.[14]

### F.   Count Eight (defamation) should be dismissed because the speech is privileged.

Majdalani contends that the Individual Defendants in their individual capacities defamed him and harmed his reputation with false allegations regarding his integrity, honesty, and corrupt practices as a judge at the AIAA student competition. Compl., Doc. 1, ¶¶ 318, 336. These false statements (spoken and written) were contained in the EthicsPoint Report and throughout the disciplinary proceedings at Auburn. *Id.* at ¶¶ 222, 320, 335. Majdalani's claim for defamation must fail because the allegedly defamatory speech is privileged.

The Alabama Supreme Court has long recognized that communications made during judicial or quasi-judicial proceedings are absolutely privileged. *Webster v. Byrd*, 494 So. 2d 31, 34, 42 (Ala. 1986) (applying the privilege in a quasi-judicial proceeding in which a university president terminated a faculty member); *Walker v. Majors*, 496 So. 2d 726, 730 (Ala. 1986). The Court definitively protected an attorney's statements and communications about an opposing party and defined the factors that qualify as proceeding as "quasi-judicial":

> [w]here an administrative proceeding is conducted with the same
> safeguards as those provided in judicial proceedings, e.g., notice

---

[14]   Dr. Majdalani's civil conspiracy claim under Alabama law (Count Seven) should be dismissed with prejudice on the same basis and to the same extent. The same two-year statute of limitations applies to the Alabama state law claims of conspiracy, and like his federal law claims, Majdalani's state law claims are premised in part on his "demotion." *See* Compl., Doc. 1, ¶ 312 (incorporating, among other allegations, ¶ 298 of the Complaint) (Individual Defendants conspired among themselves and others to bring about Majdalani's "demotion.").

> and opportunity to be present, information as to charges made and opportunity to controvert such charges, the right to examine and cross-examine witnesses, the right to submit evidence on one's behalf, the right to be heard in person, and the presence of an objective decision-maker, that proceeding is quasi-judicial in nature and statements made in the course of the proceeding should be absolutely privileged.

*Webster*, 494 So. 2d at 34 (internal citation omitted).[15] This litigation privilege "is for the promotion of the public welfare, the purpose being that members of the legislature, judges of courts, jurors, lawyers, and witnesses may speak their minds freely and exercise their respective functions without incurring the risk of a criminal prosecution or an action for the recovery of damages." *Id.* at 35 (internal marks and citation omitted).

The Court limits the privilege, warning that the absolutely privileged communications "must not be published outside the circle of those who must have knowledge of them pursuant to the decision-making process. The recipient of a communication made outside the … quasi-judicial proceeding must have a direct or close relationship to that proceeding[,] or the absolute privilege is lost." *Id.* Majdalani implies that the Individual Defendants spread the purported lies to the entire Auburn community, but the facts alleged in the Complaint make it clear that this was not the case. Professors and Auburn administrators who were appointed to committees or panels to make a finding on the dispute do not constitute outside or third parties so as to meet the publication element of this tort. Rather, they are fact finders within the quasi-judicial dismissal process. *See* Compl., Doc. 1, ¶ 222 ("Faculty members and former faculty members attended the panel hearing where Assoc. Provost Winn and Thurow repeated defamatory false statements

---

[15]  It cannot be disputed that the dismissal proceedings are quasi-judicial in nature. Majdalani was served with the Report, attended a hearing to present a defense with the assistance of counsel, and had the benefit of objective decision-makers. The internal proceedings conducted by Auburn and the Individual Defendants qualify as a quasi-judicial proceeding because the proceedings were "conducted with the same safeguards as those provided in [a] judicial proceeding[ ]." *Id.* at 34.

259344.5

about Dr. Majdalani, in the presence of these faculty members and former faculty members."); ¶ 141 (alleging the EthicsPoint Report would be shared with "auditors, committee members, etc. to consider the report at each stage leading to Dr. Majdalani's dismissal").[16] Because the publication and necessary republication of the allegedly defamatory statements remained "in the circle of those who must have knowledge of them" in order to make an informed decision, the comments made in the EthicsReport and throughout the dismissal proceedings are absolutely privileged. *Webster*, 494 So. 2d at 35. For this reason, Count Eight against the Individual Defendants in their individual capacities is due to be dismissed with prejudice.

### G.   Count Nine fails to state a claim for invasion of privacy.

Majdalani's final claim alleges that Defendants Thurow, Winn, and Roberts, in their individual capacities, invaded his privacy when Thurow obtained confidential data regarding his scoring as a judge at the AIAA's conference. *See* Compl., Doc. 1, ¶¶ 346–54. Alabama recognizes the tort of invasion of privacy, which "consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private

---

[16] Majdalani specifically contends that Thurow breached the confidentiality requirements of the dismissal proceedings by sharing the EthicsPoint Report "with uninvolved faculty members, alumni, and administrators." *Id.* at ¶ 194. These individuals included Batterson, Chris Crumbly, and Cassy and Jay Dellinger at the AIAA. *Id.* at ¶ 195. Batterson was involved in the dismissal proceeding because he first alerted Thurow to the possibility of unethical behavior at the AIAA's conference. He was therefore a witness and is protected under the umbrella of the litigation privilege. Similarly, the Dellingers provided information regarding the allegations to Thurow. Thus, these parties have a "direct or close relationship to [the] proceeding." *Webster*, 494 So. 2d at 35. The Complaint fails to provide sufficient detail regarding the purported communication to Chris Crumbly to determine if the breach was made and thereby fails to comport with Rule 8 pleading standards. Further the question of publication is a legal conclusion and not a question of fact, and as such the Court is not required to accept it as true. *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1949.

Even if the Court determines Thurow did publish the allegedly defamatory statements "outside the circle," the remaining Individual Defendants are not alleged to have breached the confidentiality of the proceedings and are still entitled to the protection afforded by the absolute privilege.

259344.5

information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use." *Ex parte Birmingham News, Inc.*, 778 So. 2d 814, 818 (Ala. 2000) (internal citation and marks omitted). While it is not abundantly clear from the Complaint which wrong Majdalani is alleging, it is certain that neither intrusion into seclusion or commercial appropriation applies in this case, but the Complaint also fails to state a claim alleging publicity of private information or false light.

To state a claim for invasion of privacy based on publicity of a private matter, the plaintiff must present substantial evidence that "one who gives publicity to a matter concerning the private life of another … if the matter publicized is of a kind that (1) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Id.* (quoting the Restatement (Second) of Torts § 652D) (internal marks omitted). As the Supreme Court of Alabama noted, "[t]he first—and key—element in proving this invasion-of-privacy tort is 'publicity.'" *Id.* Publicity, on the one hand, is defined as "making a 'matter … public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* (quoting *Johnston v. Fuller*, 706 So. 2d 700, 703 (Ala. 1997)). On the other hand, "it is not an invasion of the right of privacy … to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a) (emphasis removed) (internal marks omitted). Thurow's, Winn's, and Roberts' alleged statements regarding Majdalani's scoring activity as a judge were not publicized to the "public at large" or outside a "small group of persons" who served essential functions in the University's dismissal process. *See id.* at 819 (finding that the defendant did not give "publicity" about the alleged incident when

33

the only employees told about the incident were those involved in it). Thus, Majdalani's claim fails to state a claim upon which relief can be granted.

The Complaint similarly fails to state a false light claim. Defendants Winn, Thurow, and Roberts could be liable for giving "publicity to a matter concerning another that places the other before the public in a false light … if (1) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) (internal marks and citations omitted). But false light claims also require that the matter be made public, and the same definition of "publicity" as stated above controls. *See id.* at 245 (citing *Ex parte Birmingham News, Inc.*, 778 So. 2d at 818) (noting that the standard for "publicity" is more difficult to prove than the element of "publication" in defamation). The named defendants did not make the statements to the public at large, and therefore Majdalani cannot establish the "publicity" element. Because he cannot establish a prima facie case, Count Nine is due to be dismissed with prejudice.

### H.     Because the underlying causes of action fail, the Alabama civil conspiracy claim also fails.

The Alabama Supreme Court has long recognized that a civil conspiracy claim cannot stand on its own:

> "A civil conspiracy claim operates to extend, beyond the active wrongdoer, liability in tort to actors who have merely assisted, encouraged, or planned the wrongdoer's acts. 16 Am. Jur. 2d Conspiracy § 57 (2009). "A plaintiff alleging a conspiracy *must have a valid underlying cause of action*." [*Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280 (Ala. 1993).] '[A] conspiracy claim *must fail if the underlying act itself would not support an action*.' *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993)." *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 280 (Ala. 2000).

*DGB, LLC v. Hinds*, 55 So. 3d 218, 234 (Ala. 2010). As demonstrated above, Majdalani cannot state a claim of either defamation or invasion of privacy. As such, there is no underlying cause of action to support his claim for civil conspiracy under Alabama law. Therefore, Count Seven should be dismissed with prejudice.[17]

## Conclusion

The Complaint is, in part, barred by federal and state immunities. The Board of Trustees is an improper party to the suit. Auburn is immune from suit in Counts One, Two, Five, Six, Seven, Eight, and Nine. The Individual Defendants in their official capacities enjoy the same immunity. In Counts One and Two, the Individual Defendants in their individual capacities are protected by qualified immunity. In addition, the Individual Defendants in their official and individual capacities are improper defendants to the Title VII causes of action in Counts Three and Four.

Majdalani's Complaint, littered with legal conclusions but containing only limited factual assertions, cannot support the claims he brings against Defendants. He has failed to state claims for First Amendment retaliation (Counts One and Two), disparate treatment (Count Three), hostile work environment (Count Four), and each of the state claims (Counts Seven, Eight, and Nine). Further, his claim of racial discrimination based upon § 1981 (Count Five) fails insofar as his Title VII claims fail, because they use the same analytic framework.  Finally, Majdalani's § 1985 civil rights conspiracy claim is time-barred insofar as it is based upon the loss of his Chair position.

---

[17]  Even if Majdalani's claim of civil conspiracy under Alabama law survives the Defendants' motion to dismiss on the merits, it would be barred by the two-year statute of limitations provided in Ala. Code § 6-2-38(l) as to claims that the Defendants conspired to demote Majdalani from Department Chair. *See supra*, n. 14.

For these reasons, the Defendants request the Court order that:

a)    All counts against the Board of Trustees be dismissed with prejudice;

b)    Counts One, Two, Five, Six, Seven, Eight, and Nine against Auburn be dismissed with prejudice;

c)    Counts One, Two, Five, Six, and Seven against the Individual Defendants in their official capacities be dismissed with prejudice;

d)    Counts One and Two against the Individual Defendants in their individual capacities be dismissed with prejudice;

e)    Counts Three and Four against Auburn and the Individual Defendants in their official and individual capacities be dismissed with prejudice;

f)    Count Five against the Individual Defendants in their individual capacities be dismissed with prejudice to the extent it is based on a hostile work environment claim (*see supra,* n. 10);

g)    Counts Six and Seven against the Individual Defendants in their individual capacities be dismissed with prejudice as time-barred to the extent they are based upon Majdalani's removal as Chair of the Department;

h)    Counts Seven, Eight, and Nine against the Individual Defendants in their individual capacities be dismissed with prejudice; and

i)    The claims against Defendants Leath and Hardgrave be dismissed with prejudice.

36

| Cause of Action | Defendants to be dismissed with prejudice | Basis for dismissal | Remaining Defendants |
|---|---|---|---|
| 1. First Amendment Retaliation (speech) | Auburn<br><br>Board of Trustees<br><br>Individual Defendants-official capacity<br><br>Individual Defendants-individual capacity | Immunity<br><br>Improper Defendant<br><br>Immunity<br><br>Qualified immunity | None |
| 2. First Amendment Retaliation (association) | Auburn<br><br>Board of Trustees<br><br>Individual Defendants-official capacity<br><br>Individual Defendants-individual capacity | Immunity<br><br>Improper Defendant<br><br>Immunity<br><br>Qualified immunity | None |
| 3. Title VII (disparate treatment and retaliation) | Auburn<br><br>Board of Trustees<br><br>Individual Defendants-official capacity<br><br>Individual Defendants-individual capacity | No adverse action<br><br>Improper Defendant<br><br>Improper Defendant<br><br>Improper Defendant | None |
| 4. Title VII (hostile work environment) | Auburn<br><br>Board of Trustees<br><br>Individual Defendants-official capacity<br><br>Individual Defendants-individual capacity | Not severe or pervasive<br><br>Improper Defendant<br><br>Improper Defendant<br><br>Improper Defendant | None |
| 5. § 1981 (race discrimination) | Auburn<br><br>Board of Trustees<br><br>Individual Defendants-official capacity | Immunity<br><br>Improper Defendant<br><br>Immunity | Individual Defendants* in their individual capacities only on claim regarding demotion as Chair |

259344.5

| | Individual Defendants-individual capacity | Not severe or pervasive (*see supra*, n. 10) | |
|---|---|---|---|
| 6. § 1985 (civil conspiracy) | Auburn | Immunity | Individual Defendants* in their individual capacities only on § 1985 claim(s) other than related to demotion as Chair |
| | Board of Trustees | Improper Defendant | |
| | Individual Defendants-official capacity | Immunity | |
| | Individual Defendants-individual capacity | Time-barred as claim relates to demotion as Chair | |
| 7. Alabama civil conspiracy | Auburn | Immunity | None |
| | Board of Trustees | Improper Defendant | |
| | Individual Defendants-official capacity | Immunity | |
| | Individual Defendants-individual capacity | No underlying tort and time-barred as claim relates to demotion as Chair | |
| 8. Defamation | Auburn | Immunity | None |
| | Board of Trustees | Improper Defendant | |
| | Individual Defendants-individual capacity | Privilege | |
| 9. Invasion of Privacy | Auburn | Immunity | None |
| | Board of Trustees | Improper Defendant | |
| | Individual Defendants-individual capacity | No publicity | |
| [All claims] | President Leath | No factual allegations supporting any cause of action | |
| | Dean Bill Hardgrave | | |

* The remaining Individual Defendants would be Boosinger, Winn, Thurow, Goldstein, and Teeter. No allegations are made against Goldstein or Teeter relating to the § 1981 claim to the extent it is based on Majdalani's demotion from Department Chair.  As to those two defendants, any claim relating to the Chair position should be dismissed for failure to state a claim upon which relief can be granted.

Respectfully submitted this 5th day of February, 2019.

/s/ W. Joseph McCorkle, Jr.
One of counsel for defendants

**OF COUNSEL:**

David R. Boyd (ASB-0717-D52D)
dboyd@balch.com
W. Joseph McCorkle, Jr. (ASB-3914-O65W
jmccorkle@balch.com
Aria B. Allan (ASB-2064-E10Q)
aallan@balch.com
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101
334/834-6500

**CERTIFICATE OF SERVICE**

I certify that on February 5, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Robert J. Camp
rcamp@wigginschilds.com
Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC
301 19th Street North
Birmingham, AL  35203

/s/W. Joseph McCorkle, Jr.
Of Counsel

259344.5