IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DR. JOSEPH C. MAJDALANI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:18-cv-894-JTA |
| | ) | (WO) |
| AUBURN UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, solely with respect to the applicability of the defense of qualified immunity. (Doc. No. 55.) For the reasons that follow, the Court concludes that Defendants' motion is due to be DENIED in part and GRANTED in part.

## I.    JURISDICTION

The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Docs. No. 26, 27, 28.) This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## II.    BACKGROUND

On October 18, 2018, Dr. Joseph C. Majdalani ("Plaintiff") filed this action. (Doc. No. 1.) On June 18, 2019, Plaintiff filed a Second Amended Complaint against the

following nine defendants: Auburn University ("Auburn"); Steven Leath, former President of Auburn, in his official capacity; William C. Hardgrave, former Provost for Academic Affairs at Auburn and current President of the University of Memphis, in his official and individual capacities; Timothy Boosinger, former Provost of Auburn, in his official[1] and individual capacities; John E. Winn, Associate Provost for Faculty Affairs at Auburn, in his official and individual capacities; Christopher Roberts, former Dean of the Samuel Ginn College of Engineering at Auburn and current President of Auburn, in his official and individual capacities; Brian Thurow, Chair of Aerospace Engineering at Auburn, in his individual and official capacities; R. James Goldstein, former Professor of English at Auburn, in his individual capacity; and Lawrence A. Teeter, Professor Emeritus at Auburn, in his individual capacity (collectively referred to as "Defendants"). (Doc. No. 50 at 1.) In the Second Amended Complaint, which spans 142 pages, Plaintiff alleges the following eleven causes of action:

Count I - Civil Conspiracy under Alabama Law against defendants Goldstein, Teeter, Thurow, Roberts, Winn, Boosinger, and Hardgrave, in their individual capacities;[2]

Count II - Retaliation Based on Plaintiff's Exercise of His Constitutionally Protected First Amendment Rights against defendants Boosinger, Winn, Roberts, Thurow, and Hardgrave in their individual capacities;[3]

---

[1] Although the Second Amended Complaint states in the description of the parties that "Defendant … Boosinger is sued in his individual capacity (*infra*, Counts [I]-II, VII-IX and XI)," this statement omits the fact that, in Count X, Plaintiff sued Boosinger in his official capacity. (Doc. No. 50 at 4 ¶ 11, 138 ¶ 545.)

[2] (*See* Doc. No. 50 at 91-100.)

[3] (*See* Doc. No. 50 at 101-08.)

Count III - Request for Injunctive Relief to Address Defendants' Continued Violation of Plaintiff's First Amendment Rights against defendants Winn, Roberts, and Thurow in their official capacities;[4]

Count IV - Violations of Title VII of the Civil Rights Act (Race/National Origin-Based Discrimination) against defendant Auburn;[5]

Count V - Violations of Title VII of the Civil Rights Act (Hostile Work Environment) against defendant Auburn;[6]

Count VI - Violation of Title VII of the Civil Rights Act (Retaliation) against defendant Auburn;[7]

Count VII - Violation of 42 U.S.C. § 1981 (Race-Based Discrimination, Harassment, and Retaliation) against defendants Boosinger, Winn, Thurow, Roberts, and Hardgrave in their individual capacities;[8]

Count VIII - Conspiracy to Violate Plaintiff's Civil Rights against defendants Goldstein, Teeter, Thurow, Roberts, Winn, Boosinger, and Hardgrave in their individual capacities;[9]

Count IX - Defamation of Character against defendants Thurow, Roberts, Winn, Boosinger, and Hardgrave in their individual capacities;[10]

---

[4] (*See* Doc. No. 50 at 109-12.) Regarding Plaintiff's request for injunctive relief, defendants Leath and Hardgrave are listed in this count, but they are no longer associated with Auburn University. Thus, there is no injunctive relief available as it relates to these defendants as there is no reasonable expectation for the alleged violation to recur. *See Dow Jones & Co., Inc. v. Kaye*, 256 F. 3d 1251 (11th Cir. 2001) (Claim for injunctive relief may become moot if: (1) it can be said with assurance that there is no reasonable expectation that alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated effects of alleged violations.)

[5] (*See* Doc. No. 50 at 112-18.)

[6] (*See* Doc. No. 50 at 118-20.)

[7] (*See* Doc. No. 50 at 121-22.)

[8] (*See* Doc. No. 50 at 122-25.)

[9] (*See* Doc. No. 50 at 125-28.)

[10] (*See* Doc. No. 50 at 128-38.)

Count X - Breach of Contract against defendants Thurow, Roberts, Winn, Boosinger, Hardgrave, and Leath in their official capacities;[11] and

Count XI - Invasion or Infringement Against Plaintiff's Right of Privacy against defendants Thurow, Roberts, Winn, and Boosinger in their individual capacities.[12]

(*See* Doc. No. 50.)

According to the Second Amended Complaint, Plaintiff was born in Lebanon and is of the Semitic race. Plaintiff became a citizen of the United States in 1993. Prior to August 31, 2013, Plaintiff was employed as a professor of Mechanical and Aerospace Engineering at the University of Tennessee Space Institute where he was the Arnold Chair of Excellence in Advanced Propulsion. Plaintiff applied for and received the position of Chair of the Aerospace Engineering Department at Auburn, which he assumed on September 1, 2013. Plaintiff remains employed at Auburn as a tenured professor, though he is no longer Chair of Aerospace Engineering.

Plaintiff claims that while he served as Chair of Aerospace Engineering, certain professors and administrators at Auburn – owing to their personal, racial, or national origin-based biases – conspired to terminate his employment first as chair and then as a tenured professor. Moreover, Plaintiff alleges that while chair he endured ridicule, insults, deliberate isolation, and race and national origin-based discrimination. Plaintiff further alleges that Defendants forced him from his position as Department Chair because of a

---

[11] (*See* Doc. No. 50 at 138-9.)

[12] (*See* Doc. No. 50 at 139-41.)

conspiracy fueled by racial animus and jealousy. Thereafter, while Plaintiff remained a tenured professor, Defendants attempted to discharge Plaintiff from his employment, relying on ill-gotten third-party information regarding some of his activities with the American Institute of Aeronautics and Astronautics (hereafter "AIAA"), an organization with which Plaintiff associated and served as a volunteer judge for student papers. As a result, a Faculty Dismissal Hearing Panel voted on September 29, 2018, to dismiss Plaintiff from Auburn. Following Plaintiff's appeal to the President of Auburn, Leath reversed the Faculty Dismissal Hearing Panel's vote. Furthermore, Plaintiff contends Defendants retaliated against him for filing a charge against Auburn with the Equal Employment Opportunity Commission ("EEOC").

Defendants filed the instant motion to dismiss on July 12, 2019, asking the Court to dismiss Count II of Plaintiff's Second Amended Complaint based on the affirmative defense of qualified immunity, and arguing for dismissal of the other claims on various grounds. On September 7, 2022, the Court entered an order granting the motion to dismiss in part and denying it in part. (Doc. No. 68.) Of note, the Court denied the motion to dismiss with respect to Count II,[13] finding that, "[a]t this stage, the Court finds that Plaintiff has

---

[13] In total, the September 7, 2022 Order contained the following rulings:

> 1. Defendants' motion to dismiss (Doc. No. 55) is GRANTED in part and DENIED in part.

> 2. All claims against Defendant Steven Leath are DISMISSED.

> 3. Steven Leath is hereby DISMISSED as a party to this action.

alleged Defendants acted outside their discretionary authority and thereby are not shielded by qualified immunity." (Doc. No. 68 at 20.) Defendants Hardgrave, Boosinger, Winn, Roberts, and Thurow filed an interlocutory appeal. They argued that the Court improperly ruled that, at the motion-to-dismiss stage, they were not entitled to qualified immunity on Plaintiff's First Amendment retaliation claims because they had failed to carry their burden

---

4. All claims against Defendant William C. Hardgrave in his official capacity are DISMISSED. Only the claims against Defendant Hardgrave in his individual capacity will proceed.

5. The claims against Defendants R. James Goldstein and Lawrence A. Teeter in Count I are DISMISSED.

6. Count I is DISMISSED in part. The civil conspiracy claim in Count I is DISMISSED to the extent it relies on First Amendment retaliation (Count II), defamation (Count IX), and invasion of privacy (Count XI) before October 18, 2016. The civil conspiracy claim in Count I that relies on First Amendment retaliation (Count II), defamation (Count IX), and invasion of privacy (Count XI) after October 18, 2016 may proceed. Further, the civil conspiracy action alleged in Count I related to the underlying federal claim in Count VII may proceed in its entirety.

7. Count II is DISMISSED in part. The associative speech claim in Count II is DISMISSED. The remaining claims in Count II will proceed.

8. Count III is DISMISSED in its entirety.

9. Counts IV, V, and VI are DISMISSED in part. The declaratory judgment requests in Counts IV, V, and VI are DISMISSED. The remaining claims in those Counts will proceed.

10. Court VIII is DISMISSED in part. The portion of this Count which relies on events prior to May 2, 2016 is DISMISSED. The remaining portion of Count VIII will proceed.

11. Count X is DISMISSED in its entirety.

12. The motion to dismiss (Doc. No. 55) is DENIED in all other respects.

(Doc. No. 68 at 36-37.)

to establish that their allegedly retaliatory acts were within their discretionary authority as Auburn officials. (Doc. No. 69.) The Eleventh Circuit vacated the qualified immunity ruling in the September 7, 2022 Order, reasoning that the Court "failed to 'strip out' the allegedly illegal conduct" from the analysis of the discretionary function prong of qualified immunity. (Doc. No. 77 at 6.)[14] The Circuit remanded the case "for further proceedings consistent with [its] opinion." (*Id.*)

In accordance with the remand, on October 24, 2023, the Court ordered the denial of qualified immunity in the September 7, 2022 Order be vacated, but stated "[a]ll other rulings and orders of the [C]ourt, including all other rulings entered in said order (Doc. No. 68), shall stand." (Doc. No. 79.) Thereafter, the parties submitted supplemental briefs on the motion to dismiss. (Docs. No. 82, 85, 90.) The qualified immunity ruling is fully briefed and is ready for disposition.

## III.   LEGAL STANDARD

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court takes the facts alleged in the complaint as true and construes them in the light most favorable to the plaintiff. *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). To avoid dismissal, the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

---

[14] The Eleventh Circuit's opinion (Doc. No. 77) can be found at *Majdalani v. Hardgrave*, No. 22-13192, 2023 WL 5624538, at *1 (11th Cir. Aug. 31, 2023).

*v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). While Federal Rule of Civil Procedure 8(a) "does not require 'detailed factual allegations' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A complaint is insufficient if it "offers labels and conclusions or a formulaic recitation of the elements of a cause of action," or if it "tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotations omitted) (quoting *Twombly*, 550 U.S. at 555, 557). In short, a complaint must provide a "plain statement possess[ing] enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotations omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

## IV.   DISCUSSION

In Count II of the Second Amended Complaint, Plaintiff alleges that Boosinger, Winn, Roberts, Thurow, and Hardgrave, in their individual capacities only, retaliated against him for engaging in protected First Amendment activities. (Doc. No. 50 at 101–08.) Specifically, Plaintiff alleges that "Defendants retaliated against him when he exercised his right to freely associate and engage in associative free speech." (*Id.* at 101.) This retaliation took the form of "defam[ing] Plaintiff, harass[ing] Plaintiff, and as part of that harassment intentionally, maliciously, and in bad faith subject[ing] him to a costly, unwarranted, and rigged dismissal process." (*Id.* at 101–02.)

8

The Court is not tasked with weighing evidence on a Rule 12(b)(6) motion; rather, the Court accepts as true the well-pleaded allegations in the Second Amended Complaint and construes those facts in the light most favorable to the Plaintiff. *See Resnick*, 693 F.3d at 1321–22. From the four corners of the Second Amended Complaint, Plaintiff is asserting that Defendants violated, through retaliation, his right to associate with the AIAA, his associative speech, and his speech before the EEOC and at the dismissal hearing in which he alleged that Defendants were subjecting him to race-based discrimination. (*See* Doc. No. 50 at 103 ("[H]is protected speech and association with the AIAA were the basis for his termination . . . ."); *id.* at 101-108, ¶¶ 409-435.) The Court previously dismissed Plaintiff's associative speech claim.[15] Therefore, at this time, the Court turns to the remaining two claims.

A.      Plaintiff's Association Claim

Plaintiff alleges that Defendants retaliated against him because of his association with the AIAA. (*Id.* at 101–03, 107.) Specifically, the Second Amended Complaint declares: "Plaintiff asserts Defendants retaliated against him when he exercised his right to *freely associate* . . . ." (Doc. No. 50 at 101, ¶ 412) (emphasis added). Likewise, the Complaint states, "In the spring of 2016, Dr. Majdalani's *voluntary association* with the AIAA as a judge occurred while he was on a leave of absence from his position with Auburn University." (*Id.* at 102–03, ¶ 418) (emphasis added). Finally, Plaintiff alleges:

---

[15] The portion of the September 7, 2022 Order dismissing Plaintiff's associative speech claim was not grounded in a qualified immunity analysis and remains in force. (Doc. No. 68 at 14-16, 37; Doc. No. 79.)

> Because Dr. Majdalani expressed his views while associated with the AIAA as a technical judge. Defendants took steps to punish him by defaming his character, harassing him, subjecting him to disparate terms and conditions of employment, moving to terminate his employment, and causing him substantial personal loss. The same was done to prevent his future *association* with the AIAA as a judge.

(*Id.* at 107, ¶ 429) (emphasis added).

Defendants argue that qualified immunity bars Plaintiff's associational retaliation claim. While the affirmative defense of qualified immunity is normally presented at the summary judgment stage, a party may move to dismiss based on the doctrine as well. *See Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). As articulated by the Eleventh Circuit, "[t]he qualified immunity defense shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining the applicability of the qualified immunity defense, the Court "appl[ies] a two-part analysis to a government official's assertion of qualified immunity." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). First, Defendants must prove that the allegedly unconstitutional conduct [*i.e.*, the disciplinary and other alleged retaliatory actions in response to Plaintiff's association with the AIAA] occurred while they were acting within the scope of their discretionary authority. *Id.* Because Defendants have failed to carry that burden at the motion-to-dismiss stage, the Court need not proceed

to the second part of the analysis, which is to evaluate Plaintiff's proof that Defendants' conduct violated clearly established law. *Id*. ("If, and only if, the defendant" meets its burden at the first stage of the analysis "will the burden shift to the plaintiff to establish that the defendant violated clearly established law.").

To prove that their actions were within the scope of their discretionary authority, Defendants must establish that their "actions were (1) undertaken pursuant to the performance of [their] duties, and (2) within the scope of [their] authority." *Mikko v. City of Atlanta, Ga.*, 857 F.3d 1136, 1144 (11th Cir. 2017) (citing *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995)). The "inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted).

Moreover, in considering whether the challenged action was within the scope of Defendants' duties, the Court "look[s] to the general nature of [Defendants'] actions, temporarily putting aside the fact that [they] may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266. "In other words, 'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Id.* (quoting *Harbert*, 157 F.3d at 1282) (emphasis in *Mikko* omitted). The Court "strip[s] out the allegedly illegal conduct" from the analysis to avoid creating an "untenable tautology" because a government official presumably will always lack legal authority to

11

act unconstitutionally or for an unlawful purpose. *Majdalani v. Hardgrave*, No. 22-13192, 2023 WL 5624538, at *1 (11th Cir. Aug. 31, 2023) (citations and internal quotations marks omitted); *see also Holloman*, 370 F.3d at 1266 (explaining that the reason the court does not inquire whether the defendant has the "authority to commit the allegedly illegal act" is because "[o]ne might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power."). Yet at the same time, the Court "must be sure not to characterize and assess the defendant's act at too high a level of generality." *Holloman*, 370 F.3d at 1266. If a court jumps to too high a level of abstraction in determining the scope of a defendant's duties, "it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities." *Id*. "Consequently," a court must "consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint." *Id*.

Here, Defendants urge the Court that they have the authority to investigate and discipline employees for unethical conduct and to make personnel decisions, *ergo*, "common sense" dictates that their actions were "obviously" centered well within the scope of their authority. (Doc. No. 82 at 23, 25.) For a number of reasons, Defendants' argument fails and is too inadequately developed to entitle them to dismissal on the basis of qualified immunity at this stage of the litigation. First, in addition to citing allegations in the Second Amended Complaint which they contend establish that they had roles and responsibilities related to personnel decisions and faculty dismissal proceedings, they also cite job descriptions of the provost, academic chair, and department chair found on Auburn's

website, as well as Defendant Winn's official Auburn faculty page from his tenure as Associate Provost for Faculty Affairs, thus indicating that the allegations of the Second Amended Complaint require supplementation as to the nature of their job duties for purposes of carrying their burden to show they were acting within the scope of those duties. (Doc. No. 82 at 18 n.6.) Defendants are welcome to submit additional evidence regarding their job duties at the appropriate time, but on a motion to dismiss, the Court is limited to the allegations of the complaint. *Resnick*, 693 F.3d at 1321–22.

Second and separately, in light of the allegations in the Second Amended Complaint, the fact that Defendants had roles related to personnel decisions, investigations, and faculty dismissal proceedings does not necessarily mean that they were acting "pursuant to the performance of [their] duties, and … within the scope of [their] authority" when they engaged in those activities with respect to Plaintiff's associational activities with the AIAA. *Mikko*, 857 F.3d at 1144. Here, the allegations in the Second Amended Complaint, taken as true and construed in the light most favorable to Plaintiff, establish that Auburn University, by policy and by its contract with Plaintiff, disclaimed, relinquished, and disavowed any interest in or authority over purely private associational activity such as Plaintiff's association with the AIAA. According to Plaintiff's allegations, Auburn has acknowledged that it does not have an interest in preventing Plaintiff's association with the AIAA.[16] (Doc. No. 55 at 28.) He alleges that Auburn did so for the

---

[16] Indeed, Auburn has said that while he served as the AIAA student chapter faculty advisor, Auburn encouraged and required Plaintiff to associate with the AIAA. (Doc. No. 55 at 28.)

13

purpose of fostering "academic freedom as instrumental to the university fulfilling its obligations to the public." (*Id*. at 106-07 ¶¶ 428-29.)

Furthermore, Plaintiff alleges that his association with the AIAA was purely private conduct, occurred while he was on a leave of absence from his position at Auburn, and was not part of his work as Auburn faculty or even his work as Auburn's AIAA faculty advisor. (*Id*. at 24-25, ¶¶ 131-136.) He also alleges that, pursuant to his employment contract and the Auburn faculty handbook, Auburn affirmatively "relinquished any right it may have to control Dr. Majdalani's academic freedom, inclusive of his associative rights under the First Amendment." (*Id*. at 88 ¶ 385.) Thus, the Second Amended Complaint contains sufficient allegations to support the conclusion that Auburn had no interest in stopping Plaintiff's association with the AIAA and that Auburn's policies affirmatively disavowed any interest in or authority over private associational activity such as Plaintiff's association with the AIAA. Hence, aside from (and ignoring for the moment) the alleged illegality and unconstitutionality of Defendants' actions, those actions reached beyond the scope of the authority Auburn (and they, by extension) wielded over personnel issues and faculty investigations and disciplinary proceedings, even if those actions had been carried out for a constitutionally and legally proper purpose.

Defendants have ignored and failed to develop any argument as to Plaintiff's allegations that they acted outside the scope of their employment duties because they investigated and pursued personnel discipline related to wholly private conduct which, according to the allegations of the Second Amended Complaint, Auburn had allegedly disclaimed any jurisdiction to police. Granted, among the cases Defendants cite are cases

14

indicating that, rather than considering whether a defendant has authority to engage in improper conduct by or for the purpose of violating the law or the constitution, the Court should consider instead whether the defendant had the authority to do the act complained of (*e.g.*, harshly grade a paper, impose employee discipline, taking various personnel actions). However, the cases Defendants cite in support of their argument do not meet their burden and are distinguishable. None of those cases involve allegations that a defendant exceeded the limits a public employer expressly placed on itself[17] (and, by extension, the defendants who acted as the entities' agents) in investigating and imposing discipline on the wholly private associational activities of its employees.[18] Here, however, Plaintiff has

---

[17] Again, the Court emphasizes that it is distinguishing between the authority *Auburn allotted to itself and its officials* to regulate employee associational activities on the one hand, and the limitations placed on that authority *by the law and the constitution* on the other. For purposes of this discussion, the Court is ignoring any boundaries the *law* places on Defendants' authority, while simultaneously avoiding defining the conduct at issue at too high a level of generality by recognizing the alleged facts pertaining to the scope of authority Auburn afforded itself and its agents in this case. *See Holloman*, 370 F.3d at 1266 ("[W]e look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances…. Of course, we must be sure not to characterize and assess the defendant's act at too high a level of generality.").

[18] *See Mikko*, 856 F.3d at 1145 (finding that the defendant prosecutors acted within the outer perimeter of their authority by interfering with the local police department's forensic scientist's private contract to provide expert defense testimony in another jurisdiction because the scientist's activities in that other jurisdiction affected the prosecutors' ability to use the scientist as an expert witness in their own cases); *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182-84 (11th Cir. 1997) (skipping the first prong of the qualified immunity analysis entirely (thus creating the inference that there was no dispute on appeal that the first prong had been met and that the defendants were acting in the scope of their authority), and determining that the defendants were entitled to qualified immunity because it was not clearly established that a person's in-house criticism of a textbook was constitutionally protected speech); *McLaughlin v. Fla. Int'l Univ. Bd. of Trustees*, 533 F. Supp. 3d 1149, 1176 (S.D. Fla. 2021), *aff'd*, No. 21-11453, 2022 WL 1203080 (11th Cir. Apr. 22, 2022) (containing a one-paragraph, conclusory analysis determining that a professor acted within his discretionary authority in "instructing a classroom, grading exams, and serving on an academic dismissal committee" when allegedly unconstitutionally retaliating against a student for private

alleged in his complaint that his private associational activities were beyond the ambit and scope of Defendants' authority, even if done for a lawful purpose, because Auburn disclaimed and restricted itself from exercising any authority over employees' conduct with respect to such activities. Thus, the Second Amended Complaint contains allegations sufficient to establish that, regardless of whether Defendants' actions violated the law, their actions exceeded the outer bounds of their authority as Auburn itself defined that authority.

---

expression of her political beliefs); *Seals v. Leath*, No. 3:19-cv-468-ALB-JTA, 2019 WL 6997398, at *6 (M.D. Ala. Dec. 18, 2019) (finding, for purposes of considering the applicability of the intracorporate conspiracy doctrine, that Defendant Boosinger and others acted within the scope of their authority when they removed an employee from his position, blocked his position on certain committees, reorganized his department, and reduced his teaching assistant support in retaliation for the plaintiff's activities related to his position and the university, such as posting an unflattering cartoon of university officials on his office door and serving as a media source about a university scandal involving the athletic department's alleged efforts to create an academically worthless major for student athletes); *Students for Life USA v. Waldrop*, 90 F. Supp. 3d 1265, 1277-78 (S.D. Ala. 2015) (in which the plaintiff admitted the defendants' challenged acts and omissions fell within their discretionary authority when the defendants created and enforced university policies that allegedly interfered with the plaintiff's rights to protest on campus by limiting the plaintiff's demonstrations to areas approved as free-speech zones for on-campus demonstrations); *Mousa v. Bd. of Trustees of Univ. of Ala.*, No. 7:12-CV-03008-MHH, 2014 WL 1338110, at *3 (N.D. Ala. Mar. 31, 2014) (in which the court concluded the defendants were acting within their discretionary authority; the plaintiff conceded the defendants were acting in the course and scope of their agency as university officials in investigating and taking action regarding allegations of employment-related misconduct and in allegedly writing two letters rejecting the plaintiff's application for a math instructor position); *Univ. of Ala. Bd. of Trustees v. New Life Art, Inc.*, No. 7:05-CV-00585-UWC, 2008 WL 11334604, at *3 (N.D. Ala. Apr. 30, 2008) (holding that the university officials acted within the scope of their discretionary authority because the plaintiffs "alleged no facts implying anything other than a vigorous attempt on behalf of [the defendants] to protect the trademarks of the University" and because the defendant university officials' actions to protect the university's intellectual property was "directly within the scope of traditional University functions"); *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1998) (holding that, "[c]ertainly, it is within the scope and authority of school officials to schedule and conduct extracurricular activities," and the fact that defendants scheduled and conducted those activities in an unconstitutionally racist way did not remove the defendants' actions from within the ambit of their authority because "[a] defendant is not failing to act within his discretion merely because he or she is doing something unlawful").

By way of analogy, in general, qualified immunity cases analyzing the discretionary authority of police often consider merely whether the defendant officer had the authority to do the act that allegedly caused the injury (*e.g.*, conduct a search, make an arrest, etc.). *See Holloman*, 370 F.3d 1252, 1266 (11th Cir. 2004) ("[I]n assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in unconstitutional searches and seizures, but whether engaging in searches and seizures in general is a part of his job-related powers and responsibilities."); *Mears v. McCulley*, 881 F. Supp. 2d 1305, 1318–19 (N.D. Ala. 2012) ("Investigating crimes, conducting searches, and making arrests are legitimate job-related functions within the discretionary authority of police officers."). *Cf. Harbert*, 157 F.3d at 1283 ("Addressing the discretionary authority issue [in *Sims v. Metro. Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992)], we did not ask whether it was within the defendants' authority to suspend an employee for an improper [*i.e.*, unlawful or unconstitutional] reason; instead, we asked whether their discretionary duties included the administration of discipline.") (*Cf also* Doc. No. 82 at 23-27 (in which Defendants invite the Court to conclude that they were acting within their discretionary authority because their job duties included such things as investigating and disciplining Auburn University personnel).)

However, sometimes (as here) a plaintiff alleges that something other than the law or the constitution limits the scope of the officer's authority, in which case a court will consider those additional allegations in determining whether the officer was acting within his discretionary function. For example, when a police officer allegedly makes an arrest (an act normally within his job description) outside of his jurisdiction, a court will consider

the state-imposed limitations on the officer's jurisdiction in determining whether the arrest was within the scope of the officer's authority. *See*, *e.g.*, *Ball v. City of Coral Gables*, No. 07-20949-CIV, 2007 WL 9706910, at *5 (S.D. Fla. Dec. 19, 2007). As United States District Judge W. Keith Watkins has explained, in considering whether an officer exceeded his discretionary authority by investigating a crime outside of his jurisdiction, the court was not impermissibly asking "whether it was within the defendant's authority to commit the allegedly illegal act." *Robinson v. Ash*, No. 1:16-CV-879-WKW, 2017 WL 4683932, at *5 (M.D. Ala. Oct. 18, 2017). "Rather, the court [was] asking whether it was within [the defendant's] authority to investigate a potential crime that took place outside his jurisdiction." *Id.*

Similarly, in this case, the Second Amended Complaint, as pled, alleges facts indicating that Auburn limited the scope of its (and its agents') authority by disclaiming any authority to investigate and take adverse personnel actions on employees' purely private off-campus associational activities. By considering those allegations, the Court is not asking whether it was within Defendants' authority to commit an act in violation of the law or the constitution, thus creating an "untenable tautology," *Harbert*, 157 F.3d at 1282, or conflating the two prongs of the qualified immunity analysis. Rather, the Court is asking whether it was within Defendants' authority to act on Auburn's behalf in investigating and punishing an employee's wholly private associational activity, thus defining the scope of discretionary authority Auburn afforded Defendants at the proper level of generality in

light of the facts alleged here.[19] *See Majdalani*, No. 22-13192, 2023 WL 5624538, at **1-2 (holding that, in determining whether Defendants acted within their authority, the Court must "strip out the allegedly illegal conduct," ignore any "unlawful purpose," and evaluate Defendants' actions "at the minimum level of generality necessary to remove the constitutional taint"[20] (citations and internal quotation marks omitted)). And, by ignoring Plaintiff's allegations that the private nature of his AIAA associational activity removed investigation and discipline for that associational activity from the outer scope of Defendants' discretionary authority, Defendants have not carried their burden to establish that they acted within the scope of that authority. Accordingly, with respect to Plaintiff's claim for retaliation for exercising his First Amendment freedom of association, Defendants' motion to dismiss does not entitle them to prevail on their qualified immunity defense at this time.

---

[19] Alternatively, Defendants have cited no law supporting the proposition that the law allows the court to define the outer limits of Defendants' discretionary duties without reference to Plaintiff's allegations that his private associational conduct fell outside the scope of their investigational and disciplinary authority. Again, Defendants bear the burden to establish that their actions were within their discretionary authority under the circumstances presented by the factual allegations of the Second Amended Complaint.

[20] The Court emphasizes that, as alleged, Auburn's own disclaimer of any authority to investigate or punish purely private associational activities is neither a constitutional nor a legal barrier to the scope of Defendants' powers to act on Auburn's behalf. Therefore, in considering those limitations, the court has "strip[ped] out the allegedly *illegal* conduct" and considerations of any "*unlawful*" motives, and is evaluating Defendants' actions at "the *minimum* level of generality necessary to remove the *constitutional* taint." *See Majdalani*, No. 22-13192, 2023 WL 5624538, at **1-2 (emphasis added; citations and internal quotation marks omitted).

B.     Retaliation for Complaints of Discrimination

Plaintiff alleges that Defendants "subjected [him] to disparate terms and conditions of employment, caused him financial loss, and continued to seek his dismissal after learning the stated basis for his termination lacked validity, as retribution for [his] protected speech relative to his complaints of race-based and/or national origin-based discrimination raised during the August 2017 dismissal hearing[21] and thereafter within his EEOC charge." (Doc. No. 50 at 107–08, ¶ 430.) Having previously determined that Plaintiff is not chronologically barred from pursuing a speech retaliation claim and that Plaintiff has adequately pled that the speech at issue – Plaintiff's EEOC complaint – is protected by the First Amendment (Doc. No. 68 at 17-18), the Court turns to whether qualified immunity precludes Plaintiff from pursuing this claim against Defendants.

i.     Whether Defendants Acted Pursuant to Their Official Duties

Generally speaking, the illegality of retaliating against an individual for filing an EEOC charge or making a complaint of discrimination is well-established. *See*, *e.g.*, *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1267 (11th Cir. 2008) (addressing a Title VII claim alleging retaliation for filing an EEOC charge of racial discrimination, while setting forth "an important reminder: despite considerable racial progress, racism persists as an evil to be remedied in our Nation"); *Marshall v. Daleville City Bd. of Educ.*, No. 1:05CV386-WHA, 2006 WL 2056581, at *11 (M.D. Ala. July 24, 2006) ("An objectively

---

[21] In the September 7, 2022 Order, the Court "agree[d]" with Defendants that, with respect to this claim, "any allegations of retaliation preceding Plaintiff's filing of the EEOC charge would be barred." (Doc. No. 68 at 17.) "Plaintiff sent his EEOC charge on June 5, 2017, and it was received by the EEOC on June 14, 2017." (*Id*. at 16-17 (citing Doc. No. 11-1 at 2).)

reasonable public official … would have known that retaliating against an assistant superintendent for exercising her legal right to file an EEOC charge of discrimination was prohibited by" 42 U.S.C. § 1981.). However, in determining whether Defendants were acting within the scope of their discretionary authority when they allegedly retaliated against Plaintiff for filing his EEOC charge, the known illegality and alleged unconstitutionality of the retaliatory conduct must be "stripped out" of the analysis. *Majdalani*, 2023 WL 5624538, at *1; *see also Holloman*, 370 F.3d at 1266 (explaining that the inquiry is not whether the defendant has the "authority to commit the allegedly illegal act" because, presumably, "violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power").

Unlike with Plaintiff's charge of retaliation for exercising his associational rights, Plaintiff has not pointed to specific constraints on Defendants (aside from the law and the Constitution)[22] that would remove the filing of an EEOC charge or the assertion of a

---

[22] To be sure, the Second Amended Complaint does allege that "Auburn University and its Board of Trustees have formally restricted the authority granted to Defendants Thurow, Dean Roberts, Assoc. Prov. Winn, and Provost Boosinger, as part of their employment, prohibiting them from infringing on the speech rights of the plaintiff and the similar rights of other professors." (Doc. No. 50 at 105-06 ¶ 50.) By defining the protected speech conduct solely as "speech rights," this reads merely as a restriction on violating the law (*i.e.* restricting or retaliating against First Amendment "speech rights") so long as the speech in question enjoys First Amendment protection, and regardless of the circumstances, topic, and location of that speech. Considering whether an official had the discretionary authority to violate an organization's self-prohibition on interfering solely with speech that is constitutionally protected in the first place, without more, leads to the sort of "untenable tautology" the Eleventh Circuit warned against. *Majdalani*, 2023 WL 5624538, at *1; *Holloman*, 370 F.3d at 1266. In contrast, the allegations in the Second Amended Complaint, if true and viewed in the light most favorable to Plaintiff, are sufficient to establish that, for various reasons, including the promotion of academic freedom, Auburn disclaimed authority to interfere with tenured professors' private associational activity regardless of whether that activity embodied a protected associational right under the First Amendment. Further, unlike Plaintiff's private associational activity with the AIAA, Plaintiff's allegations make clear that responding to his

discrimination complaint[23] from the sphere of Defendants' authority as Auburn officials. Rather, it appears to be both common sense and Plaintiff's position that Defendants *should* be concerned with responding (albeit properly and without a retaliatory motive) to reports of racially motivated employment discrimination, whether those complaints are made to university officials or the EEOC.

Additionally, Plaintiff has not demonstrated that, in the course of their allegedly retaliatory conduct, Defendants were performing non-job-related functions or using means beyond those ordinarily afforded to them by virtue of their positions as Auburn University's agents and officials. *Holloman*, 370 F.3d at 1265 (holding that, in assessing whether "the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities," which involves a

---

allegations of discrimination fell squarely within Defendants' ambit of authority, setting aside the alleged illegality of the retaliatory nature of that response. Accordingly, the analysis cuts differently with respect to the First Amendment claim for retaliation for Plaintiff's associational activity with the AIAA than it does for the First Amendment claim for retaliation for allegedly protected speech.

[23] Plaintiff argues that Auburn barred itself from "infring[ing] on his First Amendment rights concerning 'matters of public interest.'" (Doc. No. 85 at 16.) Yet, that does not defeat the qualified immunity claim with respect to retaliation for speech complaining of race-based discrimination. For one thing, it is essentially the same as saying that Auburn gave its officials no authority to violate the constitution, which would fail to adequately "strip out" the alleged illegality from the analysis. *See Holloman*, 370 F.3d at 1266 (explaining that the reason for ignoring the alleged illegality at this step of the qualified immunity analysis is because "[o]ne might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power"). For another thing, to the extent the "matter of public interest" is a complaint of discrimination, (1) Plaintiff has failed to adequately argue that complaints of discrimination fall outside Defendants' authority to address, if addressed in a lawful way, and (2) Plaintiff has failed to establish that such speech fell within the scope of the "matters of public interest" in which Auburn allegedly disclaimed interest in addressing.

"two-fold" inquiry: "whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize"). Rather, Plaintiff alleges that Defendants "subjected [him] to disparate terms and conditions of employment, caused him financial loss, and continued to seek his dismissal." (Doc. No. 50 at 107-08 ¶ 430.) The means[24] they used to do that were the pursuit of disciplinary proceedings and the alteration of various terms and conditions of Plaintiff's employment. Even viewing the allegations of the Second Amended Complaint in the light most favorable to Plaintiff, these fall within the ambit of Defendant's discretionary authority to impose, if done for lawful reasons.

Accordingly, the Court concludes that Defendants acted within their discretionary authority when they allegedly retaliated against Plaintiff by pursuing disciplinary proceedings against him, causing him financial loss, and continuing to seek his dismissal. *See Holloman*, 370 F.3d at 1266 ("In *Sims* [, 972 F.2d 1230], 'we did not ask whether it was within the defendant's authority to suspend an employee for an improper reason; instead, we asked whether [the defendant's] discretionary duties included the administration of discipline.'" (quoting *Harbert*, 157 F.3d at 1282)). *Cf. Thompson v. Willis*, No. 3:12-CV-03764-HGD, 2015 WL 3676139, at *13 (N.D. Ala. June 12, 2015)

---

[24] Plaintiff does allege that Defendants Boosinger and Winn "abandoned protocol" by sending an ethics complaint against him to the Senate Executive Committee rather than the Faculty Dismissal Review Committee. (Doc. No. 50 at 43-44 ¶¶ 214-18.) However, construing the Second Amended Complaint in the light most favorable to Plaintiff, that activity occurred before the filing of the EEOC charge and before the August 30, 2017 dismissal hearing at which Plaintiff allegedly complained of racially-motivated discrimination. Therefore, the Court will not consider whether the abandonment of protocol in that instance constituted means outside of any Defendant's authority to utilize.

(recommendation of the magistrate judge) (concluding that the defendant was entitled to qualified immunity with respect to a First Amendment claim for retaliation for filing an EEOC charge because, in terminating the plaintiff's employment, he was "acting within the scope of his discretionary authority as Lauderdale County Sheriff in making an employment decision regarding an employee"), *recommendation adopted*, 2015 WL 3676139 at * 2.

> ii.   Whether Defendants Violated a Clearly Established Constitutional Right

Having determined that Defendants have adequately demonstrated that they were acting within the scope of their discretionary authority with respect Plaintiff's claim for First Amendment retaliation for complaining of discrimination, the Court must next determine whether their allegedly retaliatory actions violated Plaintiff's then-clearly-established First Amendment right to freedom of speech. *Holloman*, 370 F.3d at 1264 (holding that, once a defendant establishes that his actions fell within his discretionary authority, the burden is on the plaintiff to demonstrate "that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation").

> a.   Whether Plaintiff Has Shown that the First Amendment Clearly Protects His Complaints of Discrimination at His Dismissal Hearing

When considering whether the First Amendment protects employee speech alleging employment discrimination, the proper inquiry is not whether the topic of discrimination itself (or, more specifically, discrimination at a public institution) is generally a matter of public concern. *See Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (recognizing that,

although sex-based discrimination "is a matter of important societal interest," in the context of a First Amendment retaliation claim, the court nevertheless "must determine whether the purpose of [the plaintiff's] speech was to raise issues of public concern, on the one hand, or to further h[is] own private interest, on the other"). The required approach is instead a case-specific consideration of whether the employee was subjected to retaliation for speech made in his capacity as a citizen on a matter of public concern. *See Bosarge v. Mobile Area Water & Sewer Serv.*, No. 20-14298, 2022 WL 203020, at *10 (11th Cir. Jan. 24, 2022) (unpublished opinion)[25] (applying the same rule to an EEOC charge as it did to internal complaints of discrimination: "Plaintiff's speech is entitled to constitutional protection only to the extent 'he spoke as a citizen on a matter of public concern'" (quoting *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 760 (11th Cir. 2006)[26]); *see also*, *e.g.*, *Tindal*

---

[25] *Bosarge* is not a published opinion. Eleventh Circuit Rule 36-2 provides that "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." The court's consideration of *Bosarge* throughout this opinion is solely as persuasive authority. *Bosarge* is consistent with the cases Defendants cited in their briefs (although they did not cite *Bosarge*). In any event, even if the Court were to omit *Bosarge* from the analysis with respect to any matter discussed in this Memorandum Opinion and Order, the ultimate conclusions would be the same.

[26] *Battle* enunciated the elements of a First Amendment retaliation claim, in full, as follows:

> For a public employee to sustain a claim of retaliation for protected speech under the First Amendment, the employee must show by a preponderance of the evidence these things:
>
> > (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. Once the employee succeeds in showing the preceding factors, the burden then shifts to the employer to show, by a

*v. Montgomery Cnty. Comm'n*, 32 F.3d 1535, 1540 (11th Cir. 1994) (holding that an employee's submission of an affidavit and testimony under subpoena in other employees' discrimination lawsuit "merited First Amendment protection" because the speech was "made in a public forum … not in a private context," "supported the discrimination … claims of *other* individuals, not of [the plaintiff] herself," and "did not constitute an employee grievance motivated merely "by her … rational self-interest in improving the conditions of her employment'" (emphasis in original) (quoting *Morgan*, 6 F.3d at 755)).[27]

Therefore, to support a cognizable First Amendment retaliation claim, Plaintiff's speech, as alleged in the Second Amended Complaint, must be speech (1) that he made as a citizen, rather than as an employee (2) on a matter of public concern. *Battle*, 468 F.3d at 760 ("In determining whether a public employee's speech is entitled to constitutional

---

preponderance of the evidence, that "it would have reached the same decision ... even in the absence of the protected conduct."

*Anderson v. Burke County, Ga.*, 239 F.3d 1216, 1219 (11th Cir. 2001) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977)). The first two elements are questions of law designed to determine whether the First Amendment protects the employee's speech. The third element and affirmative defense are questions of fact designed to determine whether the adverse employment action was in retaliation for the protected speech. *Id*.

*Battle,* 468 F.3d 755, 759–60.

[27] Plaintiff has not argued that his speech before the disciplinary committee at his own dismissal hearing was comparable to the litigation testimony in *Tindal*. Neither has he pointed to any case law clearly establishing that testimony at a disciplinary hearing qualifies as protected speech. *See Bosarge*, 2022 WL 203020, at *11 (acknowledging, without deciding, the plaintiff's argument that his testimony at his own and another person's disciplinary hearings constituted "protected speech under *Lane v. Franks*, 573 U.S. 228, 238, 134 S. Ct. 2369, 189 L.Ed.2d 312 (2014), in which the Supreme Court held that a public employee's truthful testimony, compelled by subpoena but given outside of the course of his ordinary job duties, was protected by the First Amendment").

protection, we must first ask 'whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." (quoting *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Yet, in his response briefs, Plaintiff makes no argument that his speech at the August 2017 dismissal hearing was more than merely speech made in his own interest on a matter of personal concern but involved speech as a private citizen on a matter of public concern. Neither does he point to any allegations in the Second Amended Complaint that would aid him in making that argument. In his initial response brief, he argues only that his EEOC charge constituted protected public speech. (Doc. No. 61 at 38-39.) In his supplemental response brief, he argues only that he "was acting as a citizen when engaged in free association," even abandoning any response to Defendants' argument that his EEOC charge was not clearly established as protected speech.  (Doc. No. 85 at 22-25.)

Accordingly, Plaintiff has not met his burden to demonstrate that, at the time of Defendants' allegedly retaliatory actions, it was clearly established that, in making allegations of discrimination at his own dismissal hearing, he engaged in speech as a private citizen on a matter of public concern. *Holloman*, 370 F.3d at 1264 (holding that, if a defendant establishes that he or she was "engaged in a discretionary function … then the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity" by establishing that the Defendant violated a right that was clearly established at the time of the violation). Hence, on qualified immunity grounds, Defendants' motion to dismiss is due to be granted with respect to Plaintiff's First Amendment claim alleging retaliation for voicing discrimination complaints at the August 2017 dismissal hearing.

       b.     Whether Plaintiff Has Shown that the First Amendment Clearly
                Protects His Filing of an EEOC Charge

While the illegality of retaliating against an individual for filing an EEOC charge is

well-established in the context of other types of claims, such as those brought pursuant to

Title VII, Plaintiff has not demonstrated that it is well-established in the context of his First

Amendment retaliation claim. Plaintiff argues that filing an EEOC charge "may" express

a public concern for purposes of establishing First Amendment protection in the context of

a retaliation claim.[28] (Doc. No. 61 at 38-39.) The cases Plaintiff cites in support of this

proposition do not expressly so hold. In *Connick v. Myers*, 461 U.S. 138 (1983) the

Supreme Court held, in a case involving a state employee's First Amendment retaliation

for speech that did *not* include making an EEOC charge,[29] that the plaintiff's

> right to protest racial discrimination—a matter inherently of public
> concern—is not forfeited by her choice of a private forum…. Here, however,
> a questionnaire not otherwise of public concern does not attain that status
> because its subject matter could, in different circumstances, have been the
> topic of a communication to the public that might be of general interest.

---

[28] In the September 7, 2022 Order, the Court found that the EEOC charge was a matter of public
concern and that the Second Amended Complaint therefore stated a First Amendment retaliation
claim upon which relief can be granted. (*See* Doc. No. 68 at 17 ("As Plaintiff has noted, *and
Defendant has agreed*, filing an EEOC charge may express a public concern. (*See* Doc. No. 61 at
38; Doc. No. 66 at 18.)" (emphasis added).) On remand, in arguing that qualified immunity does
not apply to this claim on grounds that no clearly-established right was violated, Defendants
contend that the Second Amended Complaint does not state a First Amendment retaliation claim
with respect to the EEOC charge because the EEOC charge is not public speech. (Doc. No. 82 at
41.) To the extent that Defendants' arguments may call into question whether Plaintiff has, in fact,
alleged a cognizable First Amendment retaliation claim for his speech on a matter of public
interest, that argument is moot at this point. The claim is barred due to qualified immunity because,
in any event, the public nature of Plaintiff's speech is not *clearly* established.

[29] In *Connick*, the Supreme Court considered "whether the First and Fourteenth Amendments
prevent the discharge of a state employee for circulating a questionnaire concerning internal office
affairs." *Connick*, 461 U.S. at 140.

*Connick*, 461 U.S. at 148 n. 8.

*General Telephone Company of the Northwest, Inc., v. EEOC*, 446 U.S. 318, 1320, 325-26 (1980), also did not involve a First Amendment retaliation claim for filing an EEOC charge. There, the court discussed the EEOC's role in fulfilling the public interest in the context of determining "whether the Equal Employment Opportunity Commission (EEOC) may seek classwide relief under § 706(f)(1) of Title VII of the Civil Rights Act of 1964 (Title VII) without being certified as the class representative under Rule 23 of the Federal Rules of Civil Procedure."[30] 446 U.S. at 320.

---

[30] Possibly due to typographical errors, Plaintiff's brief improperly combined phrases from various sentences in *General Telephone* to create a new sentence without correctly indicating that, in the original, those phrases were not all from the same sentence. Plaintiff quoted *General Telephone* as stating: "'[T]he EEOC is not merely a proxy for the victims of discrimination. . . the agency is guided by 'the overriding public interest in equal employment opportunity. . . asserted through direct Federal enforcement.'" *General Telephone Co. v. EEOC*, 446 U.S. 318, 326 (1980) (quoting 118 Cong. Rec. 4941 (1972)).'" (Doc. No. 61 at 38.) The quoted material comes from the following paragraph:

> This understanding of the statute [that the EEOC may sue in its own name to enforce federal law by obtaining relief for individuals injured by discriminatory acts] is supported by the purpose of the 1972 amendments of providing the EEOC with enforcement authority. The purpose of the amendments, plainly enough, was to secure more effective enforcement of Title VII. As Title VII was originally enacted as part of the Civil Rights Act of 1964, the EEOC's role in eliminating unlawful employment practices was limited to "informal methods of conference, conciliation, and persuasion." Civil actions for enforcement upon the EEOC's inability to secure voluntary compliance could be filed only by the aggrieved person. § 706(e), 78 Stat. 260. Congress became convinced, however, that the "failure to grant the EEOC meaningful enforcement powers has proven to be a major flaw in the operation of Title VII." 7 S.Rep. No. 92–415, p. 4 (1971). The 1972 amendments to § 706 accordingly expanded the EEOC's enforcement powers by authorizing the EEOC to bring a civil action in federal district court against private employers reasonably suspected of violating Title VII. In so doing, Congress sought to implement the public interest as well as to bring about more effective enforcement of private rights. The amendments did not transfer all private enforcement to the EEOC and assign to that agency exclusively the task of

Plaintiff also cites *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68 (1984), and *EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1089 (5th Cir. 1987) for the general assertion that "[t]he primary purpose of an EEOC charge is not to seek relief from the employer, but rather to inform the EEOC of possible discrimination." (Doc. No. 61 at 38.) In *Shell Oil*, the Supreme Court considered how much information must be included in an EEOC charge and provided to an employer before the EEOC may obtain judicial enforcement of an investigatory subpoena for that employer's personnel and other records. 466 U.S. at 56. In the course of its analysis, the Supreme Court noted that "a charge of employment discrimination is not the equivalent of a complaint initiating a lawsuit." *Id.* at 68. Instead, "[t]he function of a Title VII charge … is to place the EEOC on notice that someone (either a party claiming to be aggrieved or a Commissioner) believes that an employer has violated

protecting private interests. The EEOC's civil suit was intended to supplement, not replace, the private action. *Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 45 … (1974). The EEOC was to bear the primary burden of litigation, but the private action previously available under § 706 was not superseded. Under § 706(f)(1), the aggrieved person may bring his own action at the expiration of the 180-day period of exclusive EEOC administrative jurisdiction if the agency has failed to move the case along to the party's satisfaction, has reached a determination not to sue, or has reached a conciliation or settlement agreement with the respondent that the party finds unsatisfactory. The aggrieved person may also intervene in the EEOC's enforcement action. *These private-action rights suggest that the EEOC is not merely a proxy for the victims of discrimination and that the EEOC's enforcement suits should not be considered representative actions subject to Rule 23.* Although the EEOC can secure specific relief, such as hiring or reinstatement, constructive seniority, or damages for backpay or benefits denied, on behalf of discrimination victims, *the agency is guided by "the overriding public interest in equal employment opportunity . . . asserted through direct Federal enforcement.*" 118 Cong.Rec. 4941 (1972). When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate the public interest in preventing employment discrimination.

*Gen. Tel.*, 446 U.S. at 325–26 (emphasis added; footnotes omitted).

the title." *Id*. In *Cosmair*,[31] the Fifth Circuit considered the validity of "a preliminary injunction requiring [an employer] to continue severance pay and medical insurance coverage promised to an employee in exchange for a release of Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and other claims." 821 F.2d at 1087. Within that context, the court concluded that the filing of an EEOC claim did not violate the express language of the employee's express waiver of "all actions, causes of action, claims and demands whatsoever." In explaining how it reached that conclusion, the Fifth Circuit cited *Shell's* differentiation between EEOC charges and lawsuits seeking recovery from an employer. *Id*. at 1089. Thus, like *General Telephone*, neither *Shell Oil* nor *Cosmair* involved consideration of whether an employee's EEOC charge constitutes speech by a private citizen on a matter of public concern, rather than speech as an employee regarding a personal grievance. Regardless of their discussions of the "general purpose" of an EEOC charge, neither case is particularly useful in determining whether, under the facts alleged in the Second Amended Complaint, Plaintiff's EEOC charge constituted private speech on a matter of public concern.

*Bevill v. UAB Walker College*, 62 F. Supp. 2d 1259, 1280 (N.D. Ala. 1999), which Plaintiff also cites, involved several claims against a state university employer, including a claim of retaliation in violation of Title VII for (among other things) filing an EEOC charge, and a separate claim of retaliation in violation of the First Amendment for speaking

---

[31] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. *Cosmair* is not controlling precedent, as it was decided in 1987.

out against perceived sexual harassment. Notably, however, the First Amendment retaliation claim in that case did not include an allegation that filing the EEOC charge was public speech, and the EEOC charge was not the basis of the First Amendment retaliation claim.[32] Even if the reasoning of *Bevill* were to apply in a First Amendment retaliation action such as this one, it would not support a *per se* rule that filing an EEOC charge (or complaining of discrimination in the context of a dismissal hearing) is inherently speech as a private citizen on a matter of public concern. Instead, in *Bevill*, the court considered a situation where a university employee allegedly suffered retaliation for alerting others within the university to the alleged sexual harassment of a student. After consulting a number of other cases in which other courts reached varying results, the court concluded that, under the circumstances of the case under consideration, the plaintiff's speech touched on a matter of public concern.

---

[32] The *Bevill* court stated:

> The Plaintiff claims that Defendant Abrams retaliated against her in violation of her First Amendment free speech rights, actionable under 42 U.S.C. § 1983, by terminating her after she complained about Pickering's sexual harassment both "publicly" to Morgan when she displayed to Morgan copies of photographs that indicated sexually inappropriate conduct by Pickering and "privately" when Bevill was interviewed by Abrams and UAB. She also claims that Defendant Watkins retaliated against her by ratifying her termination in the grievance proceeding for engaging in the same constitutionally protected activity. The bases for her retaliation claims against Watkins and Abrams are essentially the same as those given for her Title VII retaliatory termination claim. She seeks to have Abrams found liable because he initially terminated the Plaintiff on account of her actions and to have Watkins found liable because he ultimately ratified the termination on grounds that were retaliatory.

*Bevill*, 62 F. Supp. 2d at 1282 (footnotes omitted).

In none of the cases Plaintiff cites did a court determine that the filing of an EEOC charge of discrimination or an allegation of discrimination made in the course of (and in opposition to) a dismissal proceeding inherently constitutes speech on a matter of public concern for purposes of establishing a First Amendment retaliation claim. Granted, Plaintiff does not contend that they did. Instead, Plaintiff argues that because discrimination is the topic of an EEOC charge, because discrimination is a matter of public concern, and because an EEOC charge alerts the EEOC to that matter of public concern so that the EEOC may decide whether to take action, it follows that an EEOC charge of discrimination is inherently a matter of public concern for purposes of a First Amendment retaliation claim.

Plaintiff's argument is not only founded on inferences from cases not directly on point, but it is also inconsistent with the Eleventh Circuit's approach in more closely analogous cases. Plaintiff's logic, if accepted, would create a bright-line, *per se* rule that EEOC claims are always protected by the First Amendment from retaliation by a public employer because they bring a charge before the EEOC alleging discrimination by that public employer. The Eleventh Circuit, however, has not reasoned in this way. *See Mott v. Ledbetter*, 806 F. Supp. 991, 992 (N.D. Ga. 1992) ("[T]his Court ... conclude[s] that the law in this circuit does not favor a *per se* rule establishing any employment discrimination complaint as protected speech.... [S]uch a complaint is protected speech only when the employee is speaking on a matter of legitimate public concern rather than merely complaining of a personal employment dispute."). Admittedly, the Eleventh Circuit has not definitively considered or rejected the argument that the filing of an EEOC charge is

inherently a matter of public concern because it brings an allegation of employment discrimination to the EEOC's attention.[33] Still, as indicated more fully below, Eleventh Circuit precedent is clear with respect to the factors that must be considered in determining whether a government employee's allegations of discrimination constituted speech protected from retaliation by the First Amendment. Plaintiff has not explained how *those* factors relate to the public nature of the filing of an EEOC charge, either by him or by public employees more generally.

---

[33] In *Badia v. City of Miami*, 133 F.3d 1443, 1445 (11th Cir. 1998) the Eleventh Circuit noted that the EEOC charge in question "discussed only harm that [the plaintiff] personally suffered and sought damages only to remedy that personal harm." The court further observed that, "[g]enerally, such speech which exposes personally suffered discrimination for personal benefit is not entitled to First Amendment protection." *Id*. The court recognized a circuit split on whether the filing of an EEOC charge is inherently speech on a matter of public concern. The court did not side with any of the courts involved in the split. Instead, in analyzing the second prong of the qualified immunity analysis, the Eleventh Circuit determined that, at the very least, "it is not clearly established in this Circuit that an EEOC charge and a federal court complaint involving an otherwise purely personal matter are speech on a matter of public concern that are entitled to First Amendment protection," and, thus, the defendant was entitled to qualified immunity. *Id.* at 1446.

As to the circuit split, "one circuit court of appeals has held, essentially without discussion, that the filing of a discrimination complaint is an activity protected by the First Amendment." *Mott*, 806 F. Supp. at 992 (citing *Greenwood v. Ross*, 778 F.2d 448, 457 (8th Cir. 1985)). The remainder of the circuits favor evaluating on a case-by-case basis whether, in filing an EEOC complaint, the plaintiff is speaking on a matter of public concern or is "merely complaining of a 'personal employment dispute.'" *Id*. (citing *Rice v. Ohio Dept. of Transp.*, 887 F.2d 716, 720–21 (6th Cir. 1989), *vacated on other grounds*, 497 U.S. 1001 (1990) and *Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 419–20 (7th Cir. 1988)). The courts taking a case-by-case approach are consistent with the Eleventh Circuit's case-by-case approach where public employees speak out against alleged discrimination, although the Eleventh Circuit has not issued a published opinion definitively rejecting the idea that an EEOC charge is inherently speech on a matter of public concern. In any event, Plaintiff has not cited authority from other circuits in support of his argument that the filing of an EEOC charge is inherently protected by the First Amendment from retaliation by a government employer.

The Eleventh Circuit's approach recognizes that, although "'the general subject'" of discrimination in the workplace "'is a matter of public concern, each complaint must be assessed on a case-by-case basis" to determine whether the plaintiff was speaking as a citizen, rather than as an employee, on a matter of public interest rather than personal grievance. *Booth v. Pasco Cnty., Fla.*, *Int'l Assoc. of Firefighters Local 4420*, 757 F.3d 1198, 1215 (11th Cir. 2014) (quoting *Morgan*, 6 F.3d 750).[34] For example, in *Bosarge*, 2022 WL 203020, at *10, the plaintiff alleged that his public employer retaliated against him in violation of the First Amendment because he filed an EEOC charge alleging disability discrimination by that employer. The court stated that the filing of the EEOC charge, like the employee's internal complaints of discrimination, was "entitled to constitutional protection only to the extent he 'spoke as a citizen on a matter of public concern.'" *Id*. at *10 (quoting *Battle*, 468 F.3d 755, 760 (11th Cir. 2006)). To the extent the EEOC charge constituted "[s]peech made primarily in Plaintiff's role as an employee," it "[was] not protected by the First Amendment and [could] not give rise to a First Amendment retaliation claim." *Id*. Considering the thrust of the allegations in the plaintiff's complaint in that case, the court concluded that the EEOC charge was not protected speech because it "concerned a matter of private interest—that is, Plaintiff's disqualification from a promotion he felt he was entitled to receive—rather than public concern." *Id*.

---

[34] In *Booth*, in the context of evaluating the defendant employer's First Amendment defense to a Title VII retaliation claim, the Eleventh Circuit considered the record before it and concluded that the "[p]laintiffs' filing of their EEOC charges in this case was not a matter of public concern" and, thus, neither was the defendant employer's allegedly retaliatory response. 757 F.3d at 1215.

Other district courts have found that claims of First Amendment retaliation for filing an EEOC charge are governed by the case-specific analysis the Eleventh Circuit usually applies when determining whether the employee was punished for exercising the right to free speech, not by a *per se* rule that EEOC charges constitute speech on a matter of public concern. For example, in *Merriweather v. Alabama Dep't of Pub. Safety*, 17 F. Supp. 2d 1260, 1278 (M.D. Ala. 1998) (Albritton, D.J.), *aff'd sub nom. Merriweather v. Dep't/Pub. Safety*, 199 F.3d 443 (11th Cir. 1999), the court acknowledged that "[t]he Eleventh Circuit has not expressly determined whether EEOC discrimination charges and federal court discrimination complaints which seek redress only for a plaintiff's personal injuries constitute speech on a matter of public concern." However, the court recognized "[t]he Eleventh Circuit has held that 'no First Amendment protection attaches to speech that— for personal benefit—exposes personally suffered harassment or discrimination.'" *Id.* (quoting *Tindal*, 32 F.3d at 1539). "[A]ppl[ying] that guidance in evaluating whether [the plaintiff's] filing of EEO charges … is protected speech under the First Amendment," and considering "the content, form and context of the employee's speech," the court found that the "filing of EEOC charges of racial harassment [was] a matter of personal, not public, concern and was] not entitled to First Amendment protection." *Id*; *see also Henry v. City of Tallahassee*, 149 F. Supp. 2d 1324, 1327 (N.D. Fla. 2001) (applying a similar analysis)[35]; *Taylor v. Alabama*, 95 F. Supp. 2d 1297, 1316–17 (M.D. Ala. 2000) (applying

---

[35] In *Henry*, the court reasoned:

> While the Eleventh Circuit has not resolved the specific question raised here, namely, whether an employee's complaints about racial discrimination and

a similar analysis); *Mott*, 806 F. Supp. at 992 (similarly holding that Supreme Court and Eleventh Circuit precedent do not favor a *per se* rule, and applying the usual First Amendment retaliation analysis to conclude that, under the facts of the case, the plaintiff's state-level charge of discrimination was not protected speech).

Here, Plaintiff cannot prevail on his theory that the law clearly establishes the filing of an EEOC complaint is *per se* protected speech on a matter of public interest. Even if the

---

retaliation, made in the context of EEOC proceedings or in a state court lawsuit, constitute speech protected by the First Amendment, this court is confident that the circuit court would not favor a bright-line rule either establishing all, or rejecting all, discrimination charges and/or complaints as speech protected by the First Amendment. *See Peterson v. Atlanta Housing Auth.*, 998 F.2d 904 (11th Cir. 1993) (explaining that "[t]here are simply no firm guidelines from which to work in determining whether speech is primarily of public concern or primarily personal"). Nonetheless, taking guidance from the Eleventh Circuit's decisions in cases involving similar issues, this court is convinced that when—in the context of a single-plaintiff EEOC charge or court complaint—an employee complains that he was the victim of discrimination and/or retaliation and does so for personal benefit, the main thrust of such speech will rarely, if ever, qualify as speech on a matter of "public concern." *See Maggio* [*v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000)] (holding that an employee's testimony at two administrative grievance hearings involving her supervisor—one hearing related to a grievance the supervisor filed after being charged with insubordination and a second related to the supervisor's administrative appeal of her termination—did not constitute speech on a matter of public concern); *Tindal*[, 32 F.3d 1535] (holding that an employee's in-court testimony in support of her co-workers' discrimination suit constituted speech on a matter of public concern); *Morgan v. Ford*, 6 F.3d [750 (11th Cir. 1993)] (holding that an employee who filed her own sexual harassment charges against her supervisor, first with her department's Internal Affairs Division, and then with the Georgia Office of Fair Employment Practices, did not speak on a matter of public concern but instead spoke to further her own private interest); *Jones v. Georgia*, 725 F.2d 622 (11th Cir. [1984]) (explaining that the phrase "public concern" does not encompass an employee's informal complaints about his own situation), *cert. denied*, 469 U.S. 979, 105 S. Ct. 380, 83 L.Ed.2d 316 (1984). That such speech might interest the public or relate to matters of public concern does not change the fact that the "main thrust" of the speech takes the form of a personal grievance.

*Henry*, 149 F. Supp. 2d at 1328–29.

filing of an EEOC charge may in some cases implicate the First Amendment, Plaintiff has not applied the Eleventh Circuit's case-by-case approach to demonstrate that, on the individualized facts of this case, he was speaking as a citizen on a matter of public interest when he filed his EEOC charge, rather than as an employee on a matter of private grievance.

Accordingly, Plaintiff has not met his burden to demonstrate that, at the time of Defendants' allegedly retaliatory actions, it was clearly established that his EEOC charge constituted speech by a private citizen on a matter of public concern. Hence, Defendants are entitled to qualified immunity with respect to Plaintiff's First Amendment claim alleging retaliation for complaining of race-based discrimination in the EEOC proceedings, and their motion to dismiss is due to be granted.

## V.     CONCLUSION

Accordingly, it is hereby ORDERED as follows:

1.     The Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 55) is DENIED in part with respect to Defendants' argument that qualified immunity applies to Plaintiff's claim in Count II that Defendants Boosinger, Winn, Roberts, Thurow, and Hardgrave, in their individual capacities, retaliated against him because of his association with the AIAA.

2.     The Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 55) is GRANTED in part with respect to Defendants' argument that qualified immunity applies to Plaintiff's claim in Count II that Defendants Boosinger, Winn, Roberts, Thurow, and Hardgrave, in their individual capacities,

retaliated against him because he filed an EEOC complaint and complaint of discrimination at the August 2017 dismissal hearing.

DONE this 26th day of September, 2024.

_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE